OPINION
D.W. NELSON, Senior Circuit Judge:
This case concerns the fate of two life-size panels painted by Lucas Cranach the Elder in the sixteenth century. Adam and Eve (collectively, “the Cranachs” or “the panels”) hang today in Pasadena’s Norton Simon Museum of Art (“the Museum”). Marei Von Saher claims she is the rightful owner of the panels, which the Nazis forcibly purchased from her deceased husband’s family during World War II. The district court dismissed Von Saher’s complaint as insufficient to state a claim upon which relief can be granted, and that dismissal is before us on appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.
I. Background
In reviewing the district court’s decision, we must “accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to” Von Saher. Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir.2008). We therefore hew closely to the *715 allegations in the complaint in describing the facts.
A. Jacques Goudstikker Acquires the Cranachs
For the 400 years following their creation in 1530, the panels hung in the Church of the Holy Trinity in Kiev, Ukraine. In 1927, Soviet authorities sent the panels to a state-owned museum at a monastery and in 1927 transferred them to the Art Museum at the Ukrainian Academy of Science in Kiev. Soviet authorities then began to arrange to sell state-owned artworks abroad and held an auction in Berlin in 1931 as part of that effort. This auction, titled “The Stroganoff Collection,” included artworks previously owned by the Stroganoff family. The collection also included the Cranachs, though Von Saher disputes that the Stroganoffs ever owned the panels. Jacques Goudstikker, who lived in the Netherlands with his wife, Desi, and their only child, Edo, purchased the Cra-nachs at the 1931 auction.
B. The Nazis Confiscate the Cra-nachs
Nearly a decade hence in May 1940, the Nazis invaded the Netherlands. The Goudstikkers, a Jewish family, fled. They left behind their gallery, which contained more than 1,200 artworks—the Cranachs among them. The family boarded the SS Bodegraven, a ship bound for South America. Days into their journey, Jacques accidentally fell to his death through an uncovered hatch in the ship’s deck. When he died, Jacques had with him a black notebook, which contained entries describing the artworks in the Goudstikker Collection and which is known by art historians and experts as “the Blackbook.” Desi retrieved the Blackbook when Jacques died. It lists the Cranachs as part of the Goud-stikker Collection.
Meanwhile, back in the Netherlands, high-level Nazi Reiehsmarschall Herman Goring divested the Goudstikker Collection of its assets, including the Cranachs. Jacques’ mother, Emilie, had remained in the Netherlands when her son fled to South America with his wife and child. Goring’s agent warned Emilie that he intended to confiscate the Goudstikker assets, but if she cooperated in that process, the Nazis would protect her from harm. Thus, Emilie was persuaded to vote her minority block of shares in the Goudstikker Gallery to effectuate a “sale” of the gallery’s assets for a fraction of their value.
Employees of the Goudstikker Gallery contacted Desi to obtain her consent to a sale of the majority of the outstanding shares in the gallery, which she had inherited upon Jacques’ death. She refused. Nevertheless, the sale went through when two gallery employees, unauthorized to sell its assets, subsequently entered into two illegal contracts. In the first, the “Goring transaction,” Goring “purchased” 800 of the most valuable artworks in the Goud-stikker collection. GSring then took those pieces, including the Cranachs, from the Netherlands to Germany. He displayed Adam and Eve in Carinhall, his country estate near Berlin, properties. Miedl began operating an art dealership out of Jacques’ gallery with the artwork that Goring left behind. Miedl employed Jacques’ former employees as his own and traded on the goodwill of the Goudstikker name in the art world.
C.The Allies Recover Nazi-Looted Art, Including the Cranachs
In the summer of 1943, the United States, the Netherlands and other nations signed the London Declaration, which “served as a formal warning to all concerned, and in particular persons in neu *716 tral countries, that the Allies intended to do their utmost to defeat the methods of dispossession practiced by the governments with which they [were] at war.” Yon Saher v. Norton Simon Museum of Art at Pasadena (“Von Saher I”), 592 F.3d 954, 962 (9th Cir.2010) (internal quotation marks and citation omitted). The Allies “reserved the right to invalidate wartime transfers of property, regardless of whether” those transfers took the form of open looting, plunder or forced sales. Id.
When American forces arrived on German soil in the winter of 1944 and 1945, they discovered large caches of Nazi-looted and stolen art hidden in castles, banks, salt mines and caves. Von Saher I, 592 F.3d at 962. The United States established collection points for gathering, cataloging and caring for the recovered pieces. Id. At a collection point in Munich, Allied forces identified the Cranachs and other items from the Goudstikker Collection.
In order to reunite stolen works of art with their rightful owners, President Truman approved a policy statement setting forth the procedures governing looted artwork found in areas under U.S. control. Von Saher I, 592 F.3d at 962. These procedures had two components—external restitution and internal restitution. Under external restitution, nations formerly occupied by the Germans would present to U.S. authorities “consolidated lists of items taken [from their citizens] by the Germans.” Id. These lists would include “information about the location and circumstances of the theft.” Id. American authorities would identify the listed artworks and return them to their country of origin. Id. The United States stopped accepting claims for external restitution on September 15, 1948. Id. at 963. Under internal restitution, each nation had the responsibility for restoring the externally restituted artworks to their rightful owners. Id.
In 1946, the Allied Forces returned the pieces from the Goudstikker Collection to the Dutch government so that the artworks could be held in trust for their lawful owners: Desi, Edo and Emilie.
D. Desi’s Postwar Attempt to Recover the Cranachs
In 1944, the Dutch government issued the Restitution of Legal Rights Decree, which established internal restitution procedures for the Netherlands. As a condition of restitution, people whose artworks were returned to them had to pay back any compensation received in a forced sale.
In 1946, Desi returned to the Netherlands intending to seek internal restitution of her property. Upon her return but before she made an official claim, the Dutch government characterized the Goring and Miedl transactions as voluntary sales undertaken without coercion. Thus, the government determined that it had no obligation to restore the looted property to the Goudstikker family. The government also took the position that if Desi wanted her property returned, she would have to pay for it, and she would not receive compensation for missing property, the loss of goodwill associated with the Goudstikker gallery’s name or the profits Miedl made off the gallery during the war.
Desi decided to file a restitution claim for the property sold in the Miedl transaction, so that she could recover her home and some of her personal possessions. In 1952, she entered into a settlement agreement with the Dutch government, under protest, regarding only the Miedl transaction. As part of that settlement, Desi repurchased the property Miedl took from her for an amount she could afford. The agreement stated that Desi acquiesced to the settlement in order *717 to avoid years of expensive litigation and due to her dissatisfaction with the Dutch government’s refusal to compensate her for the extraordinary losses the Goud-stikker family suffered at the hands of the Nazis during the war.
Given the government’s position that the Nazi-era sales were voluntary and because of its refusal to compensate the Goudstikk-ers for their losses, Desi believed that she would not be successful in a restitution proceeding to recover the artworks Goring had looted. She therefore opted not to file a restitution claim related to the Goring transaction. The Netherlands kept the Goring-looted artworks in the Dutch National Collection. Von Saher alleges that title in these pieces did not pass to the Dutch Government.
In the 1950s, the Dutch government auctioned off at least 63 of the Goudstikker paintings recovered from Goring. These pieces did not include the Cranachs.
E. Von Saher Recovers Artwork from the Dutch Government
In the meantime, Desi and her son Edo became American citizens, and Desi married August Edward Dimitri Von Saher. When Emilie died in 1954, she left all of her assets, including her share in the Goudstikker Gallery, to her daughter-in-law, Desi, and her grandson, Edo. Desi then died in February 1996, leaving all of her assets to Edo. Just months later, in July 1996, Edo died and left his entire estate to his wife, Marei Von Saher, the plaintiff-appellant. Thus, Marei is the sole living heir to Jacques Goudstikker.
In 1997, the State Secretary of the Dutch Government’s Ministry of Education, Culture and Science (the “State Secretary”) announced that the Dutch government had undertaken an investigation into the provenance of artworks recovered in Germany and returned to the Netherlands following Word War II. Related to that investigation, the government began accepting claims for recovered artworks in its custody that had not been restituted after the war.
Around the same time, a Dutch journalist contacted Von Saher and explained to her the circumstances regarding Goring’s looting of the Goudstikker gallery, Desi’s efforts to obtain restitution and the Dutch government’s continued possession of some Goudstikker pieces in its national collection. This conversation was the first time Von Saher learned about these events.
In 1998, Von Saher wrote to the Dutch State Secretary requesting the surrender of all of the property from the Goudstikker collection in the custody of the Dutch government. The State Secretary rejected this request, concluding that the postwar restitution proceedings were conducted carefully and declining to waive the statute of limitations so that Von Saher could submit a claim. Von Saher made various attempts to appeal this decision without success.
While Von Saher pursued various legal challenges, the Dutch government created the Ekkart Committee to investigate the provenance of art in the custody of the Netherlands. The committee described the handling of restitution in the immediate postwar period as “legalistic, bureaucratic, cold and often even callous.” It also criticized many aspects of the internal restitution process, among them employing a narrow definition of “involuntary loss” and requiring owners to return proceeds from forced sales as a condition of restitution.
Upon the recommendation of the Ekkart Committee, the Dutch government created the Origins Unknown project to trace the original owners of the artwork in its custody. The Dutch government also set up the *718 Advisory Committee on the Assessment of Restitution Applications for Items of Cultural Value and the Second World War (“the Restitutions Committee”) to evaluate restitution claims and to provide guidance to the Ministry for Education, Culture and Science on those claims. Between 2002 and 2007, the Restitution Committee received 90 claims.
In 2004, Von Saher made a restitution claim for all of the Goudstikker artwork in the possession of the Netherlands. The Committee recommended that the government grant the application with respect to all of the artworks plundered in the Goring transaction, which the Committee deemed involuntary. The State Secretary adopted the Committee’s recommendation.
Unfortunately, the Dutch government no longer had custody of the Cranachs. In 1961, George Stroganoff Scherbatoff (“Stroganoff’) claimed that the Soviet Union had wrongly seized the Cranachs from his family and unlawfully sold the paintings to Jacques Goudstikker 30 years earlier at the “Stroganoff Collection” auction in Berlin. Thus, Stroganoff claimed that the Dutch government had no right, title or interest in the panels. In 1966, the Dutch government transferred the Cranachs and a third painting to Stroganoff in exchange for a monetary payment. The terms of this transaction, including the amount Stroganoff paid for the artworks, are not in the record before us. The Dutch government did not notify Desi or Edo that Stroganoff made a claim to the panels or that the panels were being transferred to him. In 1971, New York art dealer Spencer Samuels acquired the Cranachs from Stroganoff, either as an agent or as a purchaser. Later that year, the Museum acquired the Cranachs and has possessed them ever since.
F. Von Saher Seeks Recovery From The Museum
In 2000, a Ukranian art historian researching the deaccession of artworks from state-owned museums in Kiev contacted Von Saher. He explained to Von Saher that he happened upon Adam and Eve when he visited the Museum, and once he researched the origin of the panels, he felt compelled to contact her. Because Cranach the Elder painted 30 similar depictions of Adam and Eve, Von Saher could not be certain whether the diptychs in the Museum were the ones missing from the Goudstikker collection. She contacted the Museum about the panels, and the parties engaged in a six-year effort to resolve this matter informally, which proved unsuccessful.
In May 2007, Von Saher sued the Museum, relying on California Code of Civil Procedure Section 354.3. That statute allowed the rightful owners of confiscated Holocaust-era artwork to recover their items from museums or galleries and set a filing deadline of December 31, 2010. Cal. Civ.Proc.Code § 354.3(b), (c).
The district court dismissed the action, finding Section 354.3 facially unconstitutional on the basis of field preemption. The court also found Von Saher’s claims untimely.
We affirmed, over Judge Pregerson’s dissent, holding Section 354.3 unconstitutional on the basis of field preemption. Von Saher I, 592 F.3d at 957. Because it was unclear whether Von Saher could amend her complaint to show lack of reasonable notice to establish compliance with California Code of Civil Procedure Section 338(c), we unanimously remanded. Id. at 968-70.
Six weeks after this court issued Von Saher I, the California legislature amended Section 338(c) to extend the statute of *719 limitations from three to six years for claims concerning the recovery of fíne art from a museum, gallery, auctioneer or dealer. Cal.Civ.Proc.Code § 338(c)(3)(A). In addition, the amendments provided that a claim for the recovery of fíne art does not accrue until the actual discovery of both the identity and the whereabouts of the artwork. Id. The legislature made these changes explicitly retroactive. Id. § 338(c)(3)(B).
Von Saher filed a First Amended Complaint. The Museum moved to dismiss, arguing that Von Saher’s specific claims and the remedies she sought—not the amended Section 338 itself—conflicted with the United States’ express federal policy on recovered art. The district court agreed. It held that the Solicitor General’s brief filed in the Supreme Court in connection with Von Saher’s petition for writ of certiorari from Von Saher I, “clarified the United States’ foreign policy as it specifically relates to Plaintiffs claims in this litigation.” The district court held “that the United States’ policy of external restitution and respect for the outcome and finality of the Netherlands’ bona fide restitution proceedings, as clearly expressed and explained by the Solicitor General in his amicus curiae brief, directly conflicts with the relief sought in Plaintiffs action.” The court dismissed the complaint with prejudice. Von Saher timely appeals.
II. Standard of Review
We review de novo the district court’s dismissal of Von Saher’s complaint. Manzarek, 519 F.3d at 1030. As discussed, we must accept the factual allegations in the complaint as true, and we construe the complaint in the light most favorable to Von Saher. Id. at 1031.
III. Discussion
We first must decide whether the district court erred in finding Von Saher’s claims barred by conflict preemption. It did.
A. Applicable Law
“[T]he Constitution allocates the power over foreign affairs to the federal government exclusively, and the power to make and resolve war, including the authority to resolve war claims, is central to the foreign affairs power in the constitutional design.” Deutsch v. Turner Corp., 324 F.3d 692, 713-14 (9th Cir.2003). “In the absence of some specific action that constitutes authorization on the part of the federal government, states are prohibited from exercising foreign affairs powers, including modifying the federal government’s resolution of war-related disputes.” Id. at 714.
“Foreign affairs preemption encompasses two related, but distinct, doctrines: conflict preemption and field preemption.” Movsesian v. Victoria Versicherung AG, 670 F.3d 1067, 1071 (9th Cir.2012) (en banc). In Von Saher I, we found Section 354.3 unconstitutional on the basis of field preemption. 592 F.3d at 965, 968. Here, however, the Museum’s argument focuses exclusively on conflict preemption. Specifically, the Museum contends that Von Saher’s claims, and the remedies she seeks, are in conflict with federal policy on the restitution of Nazi-stolen art.
“There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government’s policy, given the ‘concern for uniformity in this country’s dealings with foreign nations’ that animated the Constitution’s allocation of the foreign relations power to the National Government in the -first place.” Am. Ins. Ass’n v. Garamendi, 539 U.S. *720 396, 413, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427 n. 25, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)). “The exercise of the federal executive authority means that state law must give way where ... there is evidence of a clear conflict between the policies adopted by the two.” Id. at 421, 123 S.Ct. 2374. “[T]he likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law.” Id. at 420, 123 S.Ct. 2374. Similarly, a state law is preempted “where under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of’ federal policy. Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (internal quotations marks and citations omitted).
Courts have found individual claims, or even entire lawsuits, preempted where a plaintiff relies on a statute of general applicability, as Von Saher does here. See, e.g., In re: Assicurazioni Generali S.P.A Holocaust Ins. Litig., 340 F.Supp.2d 494, 501 (S.D.N.Y.2004) (holding Garamendi “requires dismissal ... of the benefits claims arising under generally applicable state statutes and common law” because “[l]itigation of Holocaust-era insurance claims, no matter the particular source of law under which the claims arise, necessarily conflicts with the executive policy favoring voluntary resolution of claims through [the International Commission on Holocaust Era Insurance Claims]”), aff'd, 592 F.3d 113 (2d Cir.2010); see also Mujica v. Occidental Petrol. Corp., 381 F.Supp.2d 1164, 1187-88 (C.D.Cal.2005) (finding plaintiffs’ state law tort claims preempted by the foreign policy interest in the United States’ “bilateral relationship with the Co-lumbian government”).
The question we must answer is whether Von Saher’s claims for replevin and conversion, as well as the remedies she seeks, conflict with federal policy. We conclude that they do not.
B. Federal Policy on Nazi-Looted Art
We start by looking to federal policy on the restitution of Nazi-looted art. As discussed, the United States signed the London Declaration and subsequently adopted a policy of external restitution based on the principles in that declaration. In Von Saher I, we noted that the United States stopped accepting claims for external restitution on September 15, 1948, and accordingly concluded that the United States’ policy of external restitution ended that year. 592 F.3d at 963. Thus, we held that California Civil Procedure Code Section 354.3 could not “conflict with or stand as an obstacle to a policy that is no longer in effect.” Id.
It seems that we misunderstood federal policy. In a 2011 brief filed in the Supreme Court recommending the denial of a petition for writ of certiorari in Von Saher I, the United States, via the Solicitor General, reaffirmed our nation’s continuing and ongoing commitment to external restitution. The Solicitor General explained that external restitution did not end in 1948 with the deadline for submitting restitution claims, as we had concluded in Von Saher I. Instead, “[t]he United States established a deadline to ensure prompt submission of claims and achieve finality in the wartime restitution process,” and the United States has a “continuing interest in that finality when appropriate actions have been taken by a foreign government concerning the internal restitution of art.”
*721 Federal policy also includes the Washington Conference Principles on Nazi Confiscated Art (“the Principles”), produced at the Washington Conference on Holocaust Era Art Assets in 1998. Though nonbinding, the Principles reflect a consensus reached by the representatives of 13 nongovernmental organizations and 44 governments, including both the United States and the Netherlands, to resolve issues related to Nazi-looted art. The Principles provided first that “Art that has been confiscated by the Nazis and not subsequently restituted should be identified” and that “[e]very effort should be made to publicize” this art “in order to locate pre-War owners and their heirs.” The signatories agreed that “[p]re-war owners and their heirs should be encouraged to come forward and make known their claims to art that was confiscated by the Nazis and not subsequently restituted.” The Principles also provided that when such heirs are located, “steps should be taken expeditiously to achieve a just and fair solution, recognizing this may vary according to facts and circumstances surrounding a specific case.” Finally, the Principles encouraged nations “to develop national processes to implement these principles,” including alternative dispute resolution.
Additionally, in 2009, the United States participated in the Prague Holocaust Era Assets Conference, which produced the “legally non-binding” Terezin Declaration on Holocaust Era Assets and Related Issues, to which the United States and the Netherlands agreed. The signatories reaffirmed their support for the Washington Conference Principles and “encourage[d] all parties[,] including public and private institutions and individuals to apply them as well.” “The Participating States urge[d] that every effort be made to rectify the consequences of wrongful property seizures, such as confiscations, forced sales and sales under duress[.]” In addition, the signatories “urge[d] all stakeholders to ensure that their legal systems or alternative processes ... facilitate just and fair solutions with regard to Nazi-confiscated and looted art and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all the relevant documents submitted by the parties.”
In sum, U.S. policy on the restitution of Nazi-looted art includes the following tenets: (1) a commitment to respect the finality of “appropriate actions” taken by foreign nations to facilitate the internal restitution of plundered art; (2) a pledge to identify Nazi-looted art that has not been restituted and to publicize those artworks in order to facilitate the identification of prewar owners and their heirs; (3) the encouragement of prewar owners and their heirs to come forward and claim art that has not been restituted; (4) concerted efforts to achieve expeditious, just and fair outcomes when heirs claim ownership to looted art; (5) the encouragement of everyone, including public and private institutions, to follow the Washington Principles; and (6) a recommendation that every effort be made to remedy the consequences of forced sales.
C. Von Saher’s Claims Do Not Conflict with Federal Policy
Von Saher’s claims do not conflict with any federal policy because the Cranachs were never subject to postwar internal restitution proceedings in the Netherlands, as noted in the complaint, the district court’s order and the opinion of the Court of Appeals of The Hague.
Desi could have brought a claim for restitution as to all of the artworks Goring looted in the immediate postwar period, but she understandably chose not to do so *722 prior to the July 1, 1951 deadline. Per Von Saher, the “[historical literature makes clear that the post-War Dutch Government was concerned that the immediate and automatic return of Jewish property to its original owners would have created chaos in the legal system and damaged the economic recovery of [t]he Netherlands,” and “[t]his attitude was reflected in the restitution process.” Desi was “met with hostility by the postwar Dutch Government” and “confronted a ‘restitution’ regime that made it difficult for Jews like [her] to recover their property.” In fact, the Dutch government went so far as to take the “astonishing position” that the transaction between Goring and the Goudstikker Gallery was voluntary and taken without coercion. Not surprisingly, Desi decided that she could not achieve a successful result in a sham restitution proceeding to recover the artworks Goring had looted. The Dutch government later admitted as much when the Ekkart Committee described the immediate postwar restitution process as “legalistic, bureaucratic, cold and often even callous.”
Moreover, the Dutch government transferred the Cranachs to Stroganoff fourteen years after Desi settled her claim against Miedl. The Museum contends that this conveyance satisfied a restitution claim Stroganoff made as the rightful heir to the Cranachs, but the record casts doubt on that characterization. As noted, the deadline for filing an internal restitution claim in the Netherlands expired July 1, 1951, and Stroganoff did not assert his claim to the Cranachs until a decade later. In addition, the Restitution of Legal Rights Decree, which governed the Dutch internal restitution process, was established to create “special rules regarding restitution of legal rights and restoration of rights in connection with the liberalization of the [Netherlands]” following World War II. The Decree included provisions addressing the restitution of wrongful acts committed in enemy territory during the war. To the extent that Stroganoff made a claim of restitution, however, it was based on the allegedly wrongful seizure of the paintings by the Soviet Union before the Soviets sold the Cranachs to Jacques Goudstikker in 1931—events which predated the war and any wartime seizure of property. Thus, it seems dubious at best to cast Stroganoff s claim as one of internal restitution.
By the time Von Saher requested in 1998 that the Dutch government surrender all of the Goudstikker artworks within state control, the Cranachs had been in the Museum’s possession for 27 years. Even if Desi’s 1998 request for surrender could be construed as a claim for restitution— made nearly 50 years after the deadline for filing such a claim lapsed—the Cra-nachs were no longer in possession of the Dutch government and necessarily fell outside that claim.[1]
Though we recognize that the United States has a continuing interest in respecting the finality of “appropriate actions” taken in a foreign nation to restitute Nazi-confiscated art, the Dutch government itself has acknowledged the “legalistic, bureaucratic, cold and often even callous” nature of the initial postwar restitution *723 system. And the Dutch State Secretary eventually ordered the return of all the Goring-looted artworks possessed by the Netherlands—the very artwork Desi chose not to seek in the postwar restitution process immediately following the war—to Yon Saher. These events raise serious questions about whether the initial postwar internal restitution process constitutes an appropriate action taken by the Netherlands.
Nevertheless, we do not even need to go so far as answering that query, nor should we on a motion to dismiss. Based on Von Saher’s allegations that (1) Desi chose not to participate in the initial postwar restitution process, (2) the Dutch government transferred the Cranachs to Stroganoff before Desi or her heirs could make another claim and (3) Stroganoff s claim likely was not one of internal restitution, the diptych was never subject to a postwar internal restitution proceeding in the Netherlands. Thus, allowing Von Saher’s claim to go forward would not disturb the finality of any internal restitution proceedings—appropriate or not—in the Netherlands.
Not only do we find an absence of conflict between Von Saher’s claims and federal policy, but we believe her claims are in concert with that policy. Von Saher is just the sort of heir that the Washington Principles and Terezin Declaration encouraged to come forward to make claims, again, because the Cranachs were never subject to internal restitution proceedings. Moreover, allowing her lawsuit to proceed would encourage the Museum, a private entity, to follow the Washington Principles, as the Terezin Declaration urged. Perhaps most importantly, this litigation may provide Von Saher an opportunity to achieve a just and fair outcome to rectify the consequences of the forced transaction with Goring during the war, even if such a result is no longer capable of being expeditiously obtained.
Nor is this dispute of the sort found to involve the international problems evident in American Insurance Association v. Garamendi In that case, California passed legislation that deemed the confiscation or frustration of World War II insurance policies for Jewish policy holders an unfair business practice. 539 U.S. at 408-11, 123 S.Ct. 2374. California’s insurance commissioner then issued administrative subpoenas against several subsidiaries of European insurance companies. Id. at 411, 123 S.Ct. 2374. Those insurance companies filed suit seeing injunctive relief against the insurance commissioner of California and challenging California’s Holocaust-era insurance legislation as unconstitutional. Id. at 412, 123 S.Ct. 2374. The Supreme Court held the law preempted due to the “clear conflict” between the policies adopted by the federal government and the state of California. Id. at 419-21, 123 S.Ct. 2374. As part of that holding, the Court noted that “[vjindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.” Id. at 421, 123 S.Ct. 2374.
Here, however, there is no Holocaust-specific legislation at issue. Instead, Von Saher brings claims pursuant to a state statute of general applicability. Also unlike Garamendi Von Saher seeks relief from an American museum that had no connection to the wartime injustices committed against the Goudstikkers. Nor does Von Saher seek relief from the Dutch government itself. In fact, the record contains a 2006 letter from the Dutch Minister for Education, Culture and Science, who confirmed that “the State of the Nether *724 lands is not involved in this dispute” between Von Saher and the Museum. The Minister also opined that this case “concerns a dispute between two private parties.”
We are not at all persuaded, as is the dissent, that the Solicitor General’s brief requires a different outcome. Certainly, “there is a strong argument that federal courts should give serious weight to the Executive Branch’s view of [a] case’s impact on foreign policy.” Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). But there are many reasons why we find that weight unwarranted here.
First, the Solicitor General’s brief, which urged denying the petition for writ of cer-tiorari in Von Saher I, focused on California Code of Civil Procedure Section 354.3. The Solicitor General argued that we had correctly invalidated Section 354.3 as “im-permissibly intruding] upon the foreign affairs authorities of the federal government.” The Solicitor General noted that Von Saher I did not involve the application of a state statute of general applicability but “a state statute that is specifically and purposefully directed at claims arising out of transactions and events that occurred in Europe during the Nazi era, that in many cases were addressed in the post-War period by the United States and European Governments])]” That is an altogether different issue from the one we now decide, which is whether Von Saher’s specific claims against the Museum—in just this one case—conflict with foreign policy. This argument is not one the Solicitor General considered or addressed when it counseled against granting certiorari in Von Saher I, and we decline to read any more into the Solicitor General’s brief than is there.
It also concerns us that the Solicitor General characterizes the facts in a way that conflicts with the complaint, the record before us and the parties’ positions. The Solicitor General argued that Von Saher I “concerns artworks and transactions that, consistent with U.S. policies, have already been the subject of both external and internal restitution proceedings, including recent proceedings by the Netherlands in response to the Washington Principles.” As we have discussed, however, the Cranachs were not subject to immediate postwar internal restitution proceedings in the Netherlands, and Von Saher’s 1998 and 2004 claims did not include the Cranachs.
This factual discrepancy also makes us wary of giving too much credence to the Solicitor General’s brief because it demonstrates that the Solicitor General goes beyond explaining federal foreign policy and appears to make factual determinations. For instance, the Solicitor General’s conclusion that the Cranachs have already been subject to both internal and external restitution proceedings is not a statement about our nation’s general approach to Nazi-looted art. Instead, the Solicitor General concludes that in this specific case involving these specific parties, external restitution took place as contemplated by the United States. This looks much like a factual finding in a matter in which we must accept the allegations in the complaint as true. While we recognize and respect the Solicitor General’s role in addressing how a matter may affect foreign policy, we do not believe this extends to making factual findings in conflict with the allegations in the complaint, the record and the parties’ arguments.
Most worrisome, the Solicitor General admitted that “[t]he United States does not contend that the fact that the Cra-nachs were returned to the Dutch government pursuant to the external restitution policy would be sufficient on its own force to 'bar litigation if, for example, the Cra-nachs had not been subject (or potentially subject to) bona fide restitution proceedings in the Netherlands.” And therein lies the most serious and troublesome obstacle *725 to our relying too heavily on the Solicitor General’s brief. Von Saher alleges, the Museum agrees and the record shows that the Cranachs were never subject to immediate postwar internal restitution proceedings in the Netherlands. Though the paintings were potentially subject to restitution proceedings had Desi opted to participate in the postwar internal restitution process, she chose not to engage in what she felt was an unjust and unfair proceeding. Years later, the Dutch government itself undermined the legitimacy of that restitution process by describing it as “bureaucratic, cold and often even callous,” and by eventually restituting to Von Saher all of the artworks Goring had looted that were still held by the Netherlands.
It would make little sense, then, for us to conclude that Von Saher’s claims against the Museum cannot go forward just because the United States returned the Cranachs to the Netherlands as part of the external restitution process, for we know and we cannot ignore, that the Cra-nachs were never subject to postwar internal restitution proceedings and that the 1998 and 2004 proceedings excluded the Cranachs. We therefore do not find convincing the Solicitor General’s position— presented in a brief in a different iteration of this case that raised different arguments, that involved different sources of law and that seems to have misunderstood some of the facts essential to our resolution of this appeal.
Von Saher’s claims against the Museum and the remedies she seeks do not conflict with foreign policy. This matter is, instead, a dispute between private parties. The district court erred in concluding otherwise.
D. Act of State
We are mindful that the litigation of this case may implicate the act of state doctrine, though we cannot decide that issue definitively on the record before us. We remand for further development of this issue.
“Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory.” Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). “[T]he act within its own boundaries of one sovereign state cannot become the subject of re-examination and modification in the courts of another. Such action when shown to have been taken, becomes, ... a rule of decision for the courts of this country.” Ricaud v. Am. Metal Co., 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733 (1918).
“In every ease in which ... the act of state doctrine appli[es], the relief sought ... would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.” W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int’l, 493 U.S. 400, 405, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). This doctrine is not “inflexible and all-encompassing,” Banco Nacional de Cuba, 376 U.S. at 428, 84 S.Ct. 923, nor is it “some vague doctrine of abstention but a principle of decision binding on federal and state courts alike,” W.S. Kirkpatrick, 493 U.S. at 406, 110 S.Ct. 701 (internal quotation marks and citation omitted). The justification for invoking the act of state doctrine “depends greatly on the importance of the issue’s implications for our foreign policy.” Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1047 (9th Cir.1983).
Von Saher seeks as remedies a declaration that she is the rightful owner of the panels and an order both quieting title in *726 them and directing their immediate delivery to her. According this kind of relief may implicate the act of state doctrine. See Oetjen v. Central Leather Co., 246 U.S. 297, 303-04, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (holding act of state doctrine barred American courts from considering the sale of animal hides by the Mexican government); Ricaud, 246 U.S. at 310, 38 S.Ct. 312 (holding act of state doctrine prohibited American courts from considering the seizure of an American citizen’s property by the Mexican government for military purposes).
Thus, it becomes important to determine whether the conveyance to Stroganoff constituted an official act of a sovereign, which might trigger the act of state doctrine. W.S. Kirkpatrick, 493 U.S. at 406, 110 S.Ct. 701 (“Act of state issues only arise when a court must decide—that is, when the outcome of the ease turns upon— the effect of official action by a foreign sovereign.”). We cannot answer this question because the record is devoid of any information about that transfer. For her part, Von Saher alleges that the Netherlands “wrongfully delivered the Cranachs to Stroganoff as part of a sale transaction,” and for the purpose of this appeal, we must accept the allegations in her complaint as true, Manzarek, 519 F.3d at 1031. She also contends that no one ever referred to the transfer of the Cranachs to Stroganoff as attendant to “restitution proceedings” until we described the facts that way in Von Saher I, 592 F.3d at 959. In her view, the Museum has since adopted that characterization of the facts. The district court is best-equipped to determine which of these competing characterizations is correct.
If on remand, the Museum can show that the Netherlands returned the Cra-nachs to Stroganoff to satisfy some sort of restitution claim, that act could “constitute a considered policy decision by a government to give effect to its political and public interests ... and so [would be] ... the type of sovereign activity that would be of substantial concern to the executive branch in its conduct of international affairs.” Clayco Petrol. Corp. v. Occidental Petrol. Corp., 712 F.2d 404, 406-07 (9th Cir.1983) (per curiam) (internal quotations and citations omitted); see also Alfred Dunhill of London, Inc. v. Rep. of Cuba, 425 U.S. 682, 695, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (noting foreign government had not offered a government “statute, decree, order, or resolution” showing that the government action was undertaken as a “sovereign matter”); but see Clayco, 712 F.2d at 406-07, 96 S.Ct. 1854 (noting the Third Circuit held that the granting of patents by a foreign sovereign would not implicate the act of state doctrine); Timberlane Lumber Co. v. Bank of Am., N.T. and S.A., 549 F.2d 597, 607-08 (9th Cir.1976) (holding judicial proceedings in another country initiated by a private party were not the sort of sovereign acts that would require deference under the act of state doctrine). On remand, the district court also should consider whether the conveyance of the Cra-nachs to Stroganoff met public or private interests. Clayco, 712 F.2d at 406 (holding that “without sovereign activity effectuating public rather than private interests, the act of state doctrine does not apply”) (internal quotation marks and citation omitted).
Even if the district court finds that the transfer of the Cranachs is a sovereign act, it also must determine whether any exception to the act of state doctrine applies. A plurality of the Supreme Court has noted that an exception may exist for “purely commercial acts” in situations where “foreign governments do not exercise powers peculiar to sovereigns” and instead “exercise only those powers that can be exer *727 cised by private citizens.” Alfred Dunhill, 425 U.S. at 704, 96 S.Ct. 1854.
We have not yet decided whether to adopt a commercial exception in our Circuit. Clayco, 712 F.2d at 408. When presented with this issue previously, we held that even if a commercial exception to the act of state doctrine existed, it did not apply because a private citizen could not have granted a concession to exploit natural resources—the government action at issue in Clayco. Id.
On the present record, we are unable to determine whether a commercial exception would apply in this case. Thus, it is unnecessary for us to determine whether our court recognizes a commercial exception to the act of state doctrine.
Other exceptions to the act of state doctrine may apply. For example, the Hick-enlooper Amendment provides that the act of state doctrine does not apply to a taking or confiscation (1) after January 1, 1959, (2) by an act of state (3) in violation of international law. 22 U.S.C. § 2370(e)(2). The Dutch government kept possession of the Cranachs in 1951 when Desi opted not to seek restitution for the artworks Goring had confiscated during the war. Though the government took possession of the pieces before the effective date of the Hickenlooper Amendment, the Dutch government transferred the Cranachs to Stro-ganoff in 1966. That conveyance may constitute a taking or confiscation from Desi. Again, we cannot determine from the record whether that transaction was a commercial sale or whether the government transferred the Cranachs to Strogranoff to restore his rights in some way. That distinction may bear on whether the Dutch government confiscated the artworks from Desi, via the transfer to Stroganoff, in violation of international law. The district court should consider this issue on remand.
We recognize that this remand puts the district court in a delicate position. The court must use care to “limit[] inquiry which would impugn or question the nobility of a foreign nation’s motivation.” Clayco, 712 F.2d at 407 (internal quotation marks and citation omitted). The court also cannot “resolve issues requiring inquiries ... into the authenticity and motivation of the acts of foreign sovereigns.” Id. at 408 (internal quotation marks and citations omitted). Nevertheless, this case comes to us as an appeal from a dismissal for failure to state a valid claim. The Museum has not yet developed its act of state defense, and Von Saher has not had the opportunity to establish the existence of an exception to that doctrine should it apply. Though this remand necessitates caution and prudence, we believe that the required record development and analysis can be accomplished with faithfulness to the limitations imposed by the act of state doctrine.
REVERSED and REMANDED.

. The dissent concludes that "the Cranachs were in fact subject to bona fide internal restitution proceedings in the Netherlands in 1998-99 and 2004-06.” Dissent at 731; see also Dissent at 732 ("Von Saher did seek 'restitution' of the Cranachs, and her filing of the claims and the official disposition of those claims do constitute proceedings.”). We cannot agree. In both 1998 and 2004, Von Saher sought the return of all the Goudstikker artworks the Dutch government had in its possession. This necessarily excludes the Cra-nachs because the Netherlands had divested itself of the panels many decades earlier. We therefore cannot conclude that Von Saher’s 1998 and 2004 claims included the Cranachs.