**CLAYCO PETROLEUM CORPORATION and Bruce Clayman, Plaintiffs-Appellants,**

v.

**OCCIDENTAL PETROLEUM CORPORATION, Occidental of Umm Al Qaywayn, Inc., and Armand Hammer, Defendants-Appellees.**

No. 80–5657.

United States Court of Appeals, Ninth Circuit.

Argued Dec. 8, 1981.

Submitted March 23, 1982.

Decided Aug. 2, 1983.

Will B. Sandler, Booth, Lipton & Lipton, New York City, for plaintiffs-appellants.

Ralph J. Shapira, Philip F. Westbrook, O'Melveny & Myers, Los Angeles, Cal., for defendants-appellees.

Before KENNEDY * and SCHROEDER, Circuit Judges, and THOMPSON,** District Judge.

PER CURIAM.

This appeal arises from an antitrust suit filed by Clayco Petroleum Corporation and Bruce Clayman, the founder and principal shareholder of Clayco against Occidental Petroleum Corporation, Occidental of Umm Al Qaywayn, Inc. and Armand Hammer (Occidental) charging Occidental with making secret payments to an official of Umm Al Qaywayn in order to obtain unlawfully an off-shore oil concession. The district court dismissed the action on the basis of the act of state doctrine.[1] We affirm.

## I. FACTS AND PROCEDURAL CONTEXT

Plaintiffs commenced this action alleging violations of section 1 of the Sherman Act, 15 U.S.C. § 1, section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), sections 16720 and 17045 of the California Business and Professions Code, and the common law. The crux of the complaint is that Occidental conspired to make and made secret payments in England and Switzerland totalling $417,000 to Sheikh Sultan bin Ahmed Muallah (Sultan), Umm Al Qaywayn's Petroleum Minister and son of its ruler, Sheikh Ahmed al Mualla (Ahmed). The complaint further alleges that only through these unlawful and anti-competitive actions did defendants secure the valuable off-shore oil concession. More specifically, plaintiffs allege that in September 1969, Ahmed agreed that Clayco would receive the concession, but instead, on November 18, 1969, he awarded the concession to defendant Occidental of Umm Al Qaywayn, Inc., Occidental Petroleum's subsidiary.

Plaintiffs allege that the first information they obtained regarding why they lost the concession became available in December 1978. The December 11, 1978, edition of the *Oakland Tribune* contained a story which said that Occidental had distributed about $30 million under "questionable legal circumstances," and that Dr. Armand Hammer, Occidental's chief executive officer, had personally disbursed $217,000 to Sultan in a London hotel room in 1969. The article also reported that a second payment of $200,000 was made to Sultan in Switzerland. The article stated, "Hammer paid the initial $217,000 as part of a $1.7 million deal with the shiekdom ... for an oil and gas concession."

In 1977, the Securities and Exchange Commission (SEC) commenced an action against Occidental alleging violations of the Securities Exchange Act of 1934 and rules promulgated thereunder, based on illegal or questionable payments made by Occidental. *Securities and Exchange Commission v. Occidental Petroleum Corp.,* No. 77–0751, (D.D.C. filed May 3, 1977). Occidental consented to the entry of a permanent injunction and agreed to conduct an internal investigation of the alleged illegal payments and to prepare for the SEC and Occidental's stockholders a special report describing such payments. Report of the Special Committee of the Board of Directors of Occidental Petroleum Corporation, *Investigated Payments and Accounting Practices of Occidental Petroleum Corporation* (April 17, 1978) (the Payments Report).

The Payments Report was filed and revealed various illegal payments. A Source Memorandum annexed to the Payments Report further recites that Occidental's $200,000 payment in Switzerland was of "uncertain legality" and was inaccurately described and documented on Occidental's books.

---

* Judge Kennedy was substituted to replace Judge Reinhardt on this panel as of January 17, 1983.

** Honorable Bruce R. Thompson, Senior United States District Judge for the District of Nevada, sitting by designation.

1. This court has held that the government of Umm Al Qaywayn is a foreign sovereign for purposes of the act of state doctrine. *Occidental v. Buttes,* 331 F.Supp. at 113. This determination was made when that nation was one of the Trucial States; the sheikdom is now part of the United Arab Emirates. This change does not warrant a redetermination of the sheikdom's status.

Plaintiffs allege that these $417,000 in payments plus "entertainment" expenses constituted bribes to induce Sultan and his father to award the concession to Occidental. Plaintiffs contend that Occidental, its subsidiary, and Dr. Hammer conspired to prevent competition and to deprive plaintiffs of the concession.

■ For the purpose of reviewing the district court's dismissal for failure to state a claim, we must assume that the facts alleged in the complaint are true. *Benson v. Arizona State Board of Dental Examiners*, 673 F.2d 272, 275 n. 7 (9th Cir.1982); *Austad v. United States*, 386 F.2d 147, 149 (9th Cir.1967). We recognize that dismissals for failure to state a claim are disfavored in antitrust actions. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). We assume, without deciding, that plaintiffs' allegations amount to antitrust violations. We must determine whether dismissal is nevertheless required because the act of state doctrine bars this action. *See Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 608 (9th Cir.1976).

The district court granted defendants' motion to dismiss, based on the act of state doctrine. The court stated that an exercise of sovereignty—the award of the offshore oil concession—was implicated in the case, and that adjudication would interfere with United States foreign policy. The court noted that plaintiffs' obligation to prove that they were damaged by defendants' conduct would necessitate review of the ethical validity of the sovereign's conduct. The court also refused to apply a commercial exception to the act of state doctrine.

## II. ISSUES

The appellants raise numerous challenges to the district court's application of the act of state doctrine. In essence, appellants argue first that this case is outside the purview of the act of state doctrine; and second, that the foreign sovereign action involved fits within "corruption" or "commercial" exceptions to the doctrine.

## III. DISCUSSION

The act of state doctrine was first enunciated in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897): "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." The doctrine is a function of our system of separation of powers and as such has "'constitutional' underpinnings." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964). It recognizes that judicial examination of the acts of foreign governments may hinder the executive and legislative branches' conduct of foreign policy. *Id.; Timberlane*, 549 F.2d at 605–06. *Sabbatino* prescribed a flexible approach to the doctrine; the critical element is the potential for interference with our foreign relations. "[T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches." 376 U.S. at 428, 84 S.Ct. at 940.

■ With this in mind, we address appellants' claim that the complained of actions in this case do not include a sovereign policy decision. We cannot agree. We acknowledge that without sovereign activity effectuating "public" rather than private interests, the act of state doctrine does not apply. *International Association of Machinists and Aerospace Workers (IAM) v. OPEC*, 649 F.2d 1354, 1360 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982); *Timberlane*, 549 F.2d at 607–08. That test is met here. This case differs from those relied upon by appellants, in which sovereign activity merely formed the background to the dispute or in which the only governmental actions were the neutral application of the laws.

For example, in *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir. 1979), the court held that the granting of patents by a foreign sovereign did not con-

stitute "a considered policy decision by a government to give effect to its political and public interests . . .," 595 F.2d at 1294, and so was "not the type of sovereign activity that would be of substantial concern to the executive branch in its conduct of international affairs." *Id.* Similarly, in *Timberlane,* the only action by the Honduran government was to enforce existing laws in a private lawsuit, reflecting no sovereign decision to disfavor the losing party. Thus the defendants, whose alleged conspiracy encompassed initiating judicial action, could not raise an act of state defense. 549 F.2d at 608. *See also Industrial Investment Development Corp. v. Mitsui & Co.,* 594 F.2d 48 (5th Cir.1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980) (background of Indonesian law requiring local partners for foreign lumber business does not entitle private party who allegedly frustrated joint venture to raise act of state defense).

In contrast, the act of state doctrine was held to bar antitrust claims in *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92 (C.D.Cal.1971), *aff'd,* 461 F.2d 1261 (9th Cir.1972), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).[2] Plaintiffs there alleged that the sovereign issued a fraudulent territorial decree to enable defendants, in the place of plaintiffs, to exploit oil and gas in the area covered by the decree. 331 F.Supp. at 101. Although *Buttes* involved a territorial decree, which is not present here, the underlying dispute in both cases concerns a sovereign decision authorizing exploitation of important national resources. *Buttes* is sufficiently analogous to call for act of state preclusion. Further, it is clear that judicial scrutiny of sovereign decisions allocating the benefits of oil development would embarrass the political branches of our government in the conduct of foreign policy. *IAM v. OPEC,* 649 F.2d at 1360–61; *Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 78 (2d Cir.

1977), *cert. denied* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1978). This conclusion is unaffected by the fact that the ruler was not named as a party. *Buttes,* 331 F.Supp. at 110–11.

Appellants also argue that the examination of foreign governmental action which this case requires is not intrusive enough to warrant an act of state defense because the concern here is the motivation behind the sovereign's act, rather than its legal validity. Appellants rely principally on the Fifth Circuit's statement that motivation and validity are not "equally protected by the act of state doctrine." *Industrial Investment Development Corp. v. Mitsui,* 594 F.2d at 55. That opinion does not foreclose application of the act of state doctrine to cases where motivation but not validity must be scrutinized. Rather, *Mitsui* holds that where the motivation for the sovereign act would be subject to a limited examination in order to measure the plaintiff's damages, and the adjudication "would result in no embarrassment to executive department action," inquiry is not foreclosed by the act of state doctrine. *Id.; cited with approval in Northrup Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1048 (9th Cir.1983). In this case, however, the very existence of plaintiffs' claim depends upon establishing that the motivation for the sovereign act was bribery, thus embarrassment would result from adjudication.

This circuit's decisions have similarly limited inquiry which would "impugn or question the nobility of a foreign nation's motivation." *Timberlane,* 549 F.2d at 607. In *Buttes,* the trial court, in an opinion adopted by this court, held judicial scrutiny of the motivation for foreign sovereign acts to be precluded by the act of state doctrine, noting that it has traditionally barred antitrust claims based on the defendant's alleged inducement of foreign sovereign action. 333 F.Supp. at 110 (citing *American Banana Co. v. United Fruit,* 213 U.S. 347, 29

---

**2.** In *Buttes,* Occidental was the plaintiff and Clayco was a defendant. The case against Clayco was dismissed on jurisdictional grounds. Defendants in that case were alleged to have induced the Ruler of Sharjah, a shiek-

dom adjacent to Umm Al Qaÿwayn, to assert fraudulently a territorial claim over off-shore waters which included the very concession at issue here and so to deprive Occidental of its concession from Umm Al Qaywayn.

S.Ct. 511, 53 L.Ed. 826 (1909)). We recently reaffirmed our unwillingness to "resolve issues requiring 'inquiries ... into the authenticity and motivation of the acts of foreign sovereigns.'" *Northrup*, 705 F.2d at 1047 (quoting *Buttes* at 110). Appellants thus cannot argue that inquiry into motivation in this case is unprotected.

We turn now to appellants' efforts to invoke exceptions to the act of state doctrine. Appellants first contend that an exception for purely commercial acts should apply in this case. A plurality of the Supreme Court recognized an exception for purely commercial activity in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), but only four Justices concurred in that section of the opinion. The *Dunhill* plurality emphasized that a commercial exception is appropriate in situations where governments are not exercising powers peculiar to sovereigns. 425 U.S. at 704, 96 S.Ct. at 1866. Unlike the context *Dunhill* envisioned, the governmental action here could not have been taken by a private citizen. Granting a concession to exploit natural resources entails an exercise of powers peculiar to a sovereign. *See United States v. California*, 332 U.S. 19, 29, 67 S.Ct. 1658, 1664, 91 L.Ed. 1889 (1947); *see generally IAM v. OPEC*, 477 F.Supp. 553, 567 (C.D.Cal.1979) (international law shows control over natural resources is exercise of sovereignty).

The Ninth Circuit has not definitively ruled on the commercial exception. *Compare Northrup*, 705 F.2d 1048 n. 25 (alluding to existence of commercial exception), *with IAM v. OPEC*, 649 F.2d at 1360 (holding that presence of a "commercial component"

does not create an exception). Because the rule espoused by the *Dunhill* plurality would not apply in any event, we need not reach the question whether to adopt an exception to the act of state doctrine for purely commercial activity.

Appellants also contend that the passage of the Foreign Corrupt Practices Act of 1977 (FCPA), 15 U.S.C. §§ 78dd–1 *et seq.* (Supp. V 1981), created an exception to the act of state doctrine which should apply in this case.[3]

The FCPA prohibits bribery of a foreign official for the purpose of obtaining or retaining business. 15 U.S.C. §§ 78dd–1, 78dd–2. The Act provides for severe criminal penalties including fines and imprisonment. 15 U.S.C. §§ 78dd–2(b), 78ff. In addition, the Attorney General may bring a civil action to enjoin impending violations. 15 U.S.C. § 78dd–2(c).

The FCPA was intended to stop bribery of foreign officials and political parties by domestic corporations. Bribery abroad was considered a "severe" United States foreign policy problem; it embarasses friendly governments, causes a decline of foreign esteem for the United States and casts suspicion on the activities of our enterprises, giving credence to our foreign opponents. H.R.Rep. No. 640, 95th Cong., 1st Sess. 5 (1977).[4] The FCPA thus represents a legislative judgment that our foreign relations will be bettered by a strict anti-bribery statute. There is also no question, however, that any prosecution under the Act entails risks to our relations with the foreign governments involved. Note, *Sherman Act Jurisdiction and the Acts of Foreign Sovereigns*, 77 Colum.L.Rev. 1247, 1261 (1977); *Department of State Responses to October*

---

**3.** Neither the Supreme Court nor a court of appeals has spoken on this issue. The district court in *Dominicus Americana Bohio v. Gulf & Western*, 473 F.Supp. 680, 690 (S.D.N.Y.1978), held, at least in the alternative, that there is a "corruption exception" to the act of state doctrine. No truly supportive authority, however, is cited by the court for that proposition. The district court in *Sage International, Ltd. v. Cadillac Gage Co.*, 534 F.Supp. 896 (E.D.Mich. 1981), said in dictum that "there is a likelihood that the doctrine could be avoided were the

allegations such as to call for review of foreign sovereign corruption charges." *Id.* at 910. The court also said in dictum that "in spirit and practice, the Act [FCPA] supports the notion that act of state concerns are subjugated to interests in stemming foreign corrupt practices." *Id.* n. 26.

**4.** It may be that the revelation of bribery, more than bribery itself, causes these problems. H.R.Rep. No. 640, 95th Cong. 1st Sess. 5 (1977).

*5, 1981 Inquiry by Congressman Timothy E. Wirth, Chairman U.S. House of Representatives Subcommittee on Telecommunications, Consumer Protection, and Finance of the Committee on Energy and Commerce* at 10–11, 13, 18, 20.

 The Justice Department and the SEC share enforcement responsibilities under the FCPA.[5] They coordinate enforcement of the Act with the State Department, recognizing the potential foreign policy problems of these actions. *See Testimony of Ernest B. Johnston, Jr., Department of State Before the Subcommittee on Telecommunications, Consumer Protection and Finance, House Committee on Energy and Commerce,* December 16, 1981 at 11; *Department of State Responses to October 5, 1981 Inquiry, supra,* at 12, 13. Executive bodies have discretion in bringing any action. *E.g. United States v. Cox,* 342 F.2d 167, 193 (5th Cir.1965) (Wisdom, J., concurring), *cert. denied,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965).[6] Therefore, any governmental enforcement represents a judgment on the wisdom of bringing a proceeding, in light of the exigencies of foreign affairs. Act of state concerns are thus inapplicable since the purpose of the doctrine is to prevent the judiciary from interfering with the political branch's conduct of foreign policy. *Sabbatino,* 476 U.S. at 423, 84 S.Ct. at 937–938; *Timberlane,* 549 F.2d at 605.

 Here, however, we are faced with a private lawsuit, rather than a public enforcement action. It is the screening of governmental proceedings, with State Department consultation, which distinguishes FCPA enforcement from private suits. *See Timberlane,* 549 F.2d at 613. Hence, in private suits, the act of state doctrine re-

mains necessary to protect the proper conduct of national foreign policy. We therefore reject appellants' contention, which is not supported by the legislative history, that in enacting the FCPA, Congress intended to abrogate the act of state doctrine in private suits based on foreign payments.

For the reasons above, we hold that the act of state doctrine applies, and that appellants do not come within any exception to the doctrine. The decision of the trial court dismissing the action is therefore AFFIRMED.

---

5. For example, in *United States v. Carver,* No. 79–1768 (S.D.Fla., filed May 1, 1979), the Justice Department took action against a bribe in circumstances similar to the ones alleged here involving the Emirate of Qatar. An example of SEC enforcement is *SEC v. Page Airways, Inc.,* No. 78–0656 (D.D.C. filed April 12, 1978), *reprinted in* Fed.Sec.L.Rep. (CCH) ¶ 96, 393 (1978).

6. Appellants argue that the matter of prosecutorial discretion is academic in this case, because the SEC action and resulting Payments Report and Source Memorandum have already publicized the events at issue here. However, the Payments Report and Source Memorandum disclose only some of the underlying facts and only raise a question as to the legality of some of the payments under Umm Al Qaywayn law. There was no inquiry into the reasons for the granting of the concession.