Concurrence by Judge Wardlaw
McKEOWN, Circuit Judge:
*1143 Hanging in the balance are Renaissance masterpieces that have been on display in California for nearly half a century. The dispute over their ownership, however, dates back to World War II, when the Nazis invaded the Netherlands.
Marei von Saher ("von Saher") seeks to recover two oil paintings that were among a group of artworks taken by Nazis in a forced sale from her father-in-law. Following the war, the Allied Forces returned the paintings to the Dutch government, which established a claims process for recouping Nazi-looted property. Von Saher's family, on the advice of counsel, chose not to file a claim on the paintings within the allotted time. In 1966, the Dutch government sold the two paintings to George Stroganoff-Sherbatoff ("Stroganoff") after Stroganoff filed a restitution claim alleging that he was the rightful owner. Stroganoff then sold the paintings in 1971 to the Norton Simon Art Foundation and the Norton Simon Museum of Art at Pasadena (collectively, "the Museum"). The paintings have been on display ever since.
In the late 1990s, von Saher tried to recover from the Dutch government all paintings included in the forced sale. The Dutch Court of Appeals issued a final decision, denying von Saher's petition for restoration of rights in the paintings. A few years later, the Dutch government nonetheless decided to return to von Saher the paintings that were still in its possession, but did not return the two paintings it had sold to Stroganoff because they were in California. Von Saher sued the Museum in federal court soon after.
This marks the third time that we have considered von Saher's case, having most recently remanded for further factual development. The district court granted summary judgment to the Museum, concluding that the Netherlands possessed good title under Dutch law when it sold the paintings to Stroganoff.
We affirm, but not under Dutch law. Because the act of state doctrine deems valid the Dutch government's conveyance to Stroganoff, the Museum has good title. Holding otherwise would require us to nullify three official acts of the Dutch government-a result the doctrine was designed to avoid.
Background
THE PAINTINGS
At the center of this controversy are two Renaissance masterworks-"Adam" and "Eve"-painted by Lucas Cranach the Elder ("the paintings" or "the Cranachs"). In 1931, Dutch art dealer Jacques Goudstikker purchased the Cranachs from the Soviet Union at an auction in Berlin called "the Stroganoff Collection."[1] The paintings became the property of the art dealership in which Goudstikker was principal shareholder ("the Goudstikker Firm" or "the Firm").
In May 1940, as the Nazis invaded the Netherlands, Goudstikker and his family fled to South America, fearing persecution and leaving behind his gallery of over 1,200 artworks. Tragically, Goudstikker died on the boat trip. His wife Desi, who *1144 acquired Goudstikker's shares in the Firm, maintained a blackbook listing all the paintings in the gallery, including the Cranachs.
After Goudstikker's death, Nazi Reichsmarschall Hermann Göring and his cohort Alois Miedl "bought" the Goudstikker Firm and its assets through a series of involuntary written agreements with a remaining employee of the Firm.[2] These "forced sales" proceeded in two parts: Miedl acquired the Firm, its showroom, some of its paintings, and the family's villa and castle for 550,000 guilders ("the Miedl transaction"). Göring purchased other artworks, including the Cranachs, for two million guilders-the equivalent of over 20 million current U.S. dollars ("the Göring transaction").
After World War II, the Allied Forces in Germany recovered much of the art collection taken from Goudstikker by Göring, including the Cranachs. The Allies turned the paintings over to the Dutch government in 1946.
THE DUTCH RESTITUTION SYSTEM
During and after the war, the Dutch government created systems of restitution and reparations for losses incurred by its citizens at the hands of the Nazis. The pillars of those systems were established in a series of royal decrees. We provide a sketch of those decrees because they bear on our decision to apply the act of state doctrine.
Royal Decree A6 and the 1947 CORVO Decision
The Dutch government enacted Royal Decree A6 in June 1940, shortly after the Nazis invaded the Netherlands. The decree prohibited and automatically nullified agreements with the enemy. A6 vested authority in a special committee (Commissie Rechtsverkeer in Oorlogstijd or "CORVO") to "revoke the invalidity" of such transactions "by declaring the agreement or act still effective."
In 1947, CORVO revoked the automatic invalidity of agreements with the enemy for property that was recuperated to the Netherlands by the Allies. As CORVO explained, A6 was enacted to protect Dutch property interests from the Nazis. But once property was returned to the Dutch government, "the initial interest of such nullity is eliminated." After property was returned to the Netherlands, the original Dutch owners could petition for a restoration of rights in the property under Royal Decree E100.
Royal Decree E100
The Dutch government enacted Royal Decree E100 in 1944. The decree established a Council for Restoration of Rights ("the Council"), with broad and exclusive authority to declare null and void, modify, or revive "any legal relations that originated or were modified during enemy occupation of the [Netherlands]."
The Council had the exclusive power to order the return of property and to restore property rights to the original Dutch owners. The Council consisted of several departments, including a Judicial Division. The restitution decisions of the other departments were appealable to the Judicial Division, whose judgments were final and non-appealable, and carried the force of a court judgment. Petitioners could bring claims for restoration of rights directly to the Judicial Division, or bring claims to other departments and appeal adverse decisions to the Judicial Division. Upon enactment of E100, the Council supplanted *1145 the Dutch common-law courts as the venue for adjudging wartime property rights, as those courts became "incompetent to hear and decide on claims or requests that the Council is competent to handle by virtue of this Decree."
The Dutch government set a July 1, 1951 deadline for claimants to file E100 restoration-of-rights petitions with the Council. After that deadline, the Council could still order restoration of rights of its own accord, but claimants were no longer entitled to demand restitution. Usually, if an original owner received money or other consideration in exchange for property taken by the Nazis, the original owner was required to return the sale price to the Dutch government in order to obtain restitution.
Decree E100 also authorized the Council to dispose of property of "unknown owners": "If the owner has not come forward within a period to be further determined by Us, items that have not yet been sold shall be sold ...." The Dutch government set the deadline for owners "com[ing] forward" at September 30, 1950.
Royal Decree E133
The Dutch government enacted Royal Decree E133 in 1944 to expropriate enemy assets in order to compensate the Netherlands for losses it suffered during World War II. Article 3 of E133 provided that within the Netherlands, all "[p]roperty, belonging to an enemy state or to an enemy national, automatically passes in ownership to the State with the entering into force of this decree ...." The expropriation of enemy property was automatic and continued until July 1951, when the Netherlands ceased hostilities with Germany.
VON SAHER'S FAMILY DECLINED TO SEEK RESTORATION OF RIGHTS IN THE CRANACHS
After the war, the Dutch government seized what previously had been the Goudstikker Firm (now the Miedl Firm) as an enemy asset and appointed new administrators. Goudstikker's widow (and von Saher's mother-in-law) Desi returned to the Netherlands to pursue restitution.
With Desi and new leadership in place, on the strategic advice of its business advisers and legal counsel, the Goudstikker Firm decided not to pursue restitution for the Göring transaction. Specifically, the Firm believed that seeking restitution would have "left [the business] with a large number of works of art that are difficult to sell"; "led to the revival of an art dealership with all pertinent negative consequences," including "find[ing] a suitable person to run such a business"; and "led to a considerable reduction in the [business's] liquid assets." The Firm's attorney Max Meyer laid out his advice in a memorandum to the Firm. A.E.D. von Saher, who later married Desi, confirmed that "the shareholders still considered to also conduct legal redress with respect to the Goering contract. Mr. Meyer and Mr. Lemberger strongly advised against this."
In 1949, Meyer wrote to the Dutch agency holding the Göring artworks to express that the Firm was releasing any claim it had to those pieces: "I would also like to take this opportunity to confirm that the Art Trade J. Goudstikker LLC waives the right to file for restoration of rights regarding goods acquired by Goering ...." The memorandum accompanying that letter showed that Meyer was aware that he could have filed a claim to restore rights in both the Göring and Miedl transactions, because they would have been voidable under E100. In proceedings before the modern Dutch Restitution Committee, Marei von Saher conceded that "Goudstikker made a deliberate and well-considered decision not to seek restoration of rights with respect to the goods that had been acquired by Göring."
By contrast, the Firm decided to pursue restitution for the Miedl transaction, including *1146 other artworks and real estate. Just shy of the July 1, 1951 E100 deadline, the Firm filed with the Council a petition for restoration of rights concerning the Miedl transaction only. In August 1952, the Firm and the Dutch government settled the Firm's restitution claims.[3]
The Dutch Government Sold the Cranachs to Stroganoff, Who Sold Them to the Museum
In the 1960s, Stroganoff petitioned the Dutch government, asserting that he was the rightful owner of the Cranachs because the Soviet government had stolen them from him. In 1966, the parties reached an amicable settlement in which Stroganoff bought "back" the paintings from the Netherlands in exchange for dropping his restitution claims.
Through his agent, in 1971 Stroganoff sold the Cranachs to the Museum for $800,000. The Cranachs have been on public display since that time.
VON SAHER PURSUED RESTITUTION FROM THE DUTCH GOVERNMENT
In the 1990s, Marei von Saher-the only living heir of Jacques and Desi Goudstikker-began seeking restitution for artworks that the Firm "sold" to Göring. As part of those efforts, von Saher filed an E100 petition for restoration of rights in the Dutch Court of Appeals (the legal successor to the Council for Restoration of Rights) for all paintings acquired by Göring, including the Cranachs. The Court of Appeals denied the petition, concluding that the Firm "made a conscious and well considered decision to refrain from asking for restoration of rights with respect to the Göring transaction." Von Saher appeared to be at a dead end.
But in 2001, the Netherlands reevaluated its "bureaucratic" restitution process, transforming its mission from a "purely legal approach" to "a more moral policy approach." In doing so, the Dutch government created a new Restitution Committee, to advise the State Secretary of Education, Culture and Science on restitution claims for property that was still in the possession of the Dutch government. Embracing the change in forum, von Saher petitioned the State Secretary for over 200 artworks that the Firm "sold" to Göring and that were still held by the Dutch government. Her claim did not include the Cranachs.
After receiving a non-binding recommendation from the Restitution Committee, the State Secretary ruled that von Saher's claim for the artworks in the Göring transaction had already been "settled" in the 1950s and in the 1999 Dutch Court of Appeals decision. The State Secretary nonetheless decided to return to von Saher all the paintings from the Göring transaction still in possession of the Dutch government. The State Secretary expressly stated that the decision to return the other paintings did not concern the Cranachs.
VON SAHER I
Out of options with the Dutch government, in 2007 von Saher filed a federal diversity action against the Museum in the Central District of California, seeking to recover the paintings. The suit alleged state-law claims for replevin, conversion, damages under California Penal Code § 496, quiet title, and declaratory relief. The action alleged timeliness under a California civil-procedure statute that allowed the rightful owners of confiscated Holocaust-era artwork to recover their items from museums or galleries and set a filing deadline of December 31, 2010. Cal. Civ. Proc. Code § 354.3(b), (c).
*1147 The district court dismissed the action, finding von Saher's claims untimely and concluding that California's special statute of limitations was unconstitutional. We affirmed, holding the California statute unconstitutional on field preemption grounds as the state was attempting to engage in foreign affairs. See Von Saher v. Norton Simon Museum of Art at Pasadena , 592 F.3d 954, 965- 68 (9th Cir. 2010) (" Von Saher I "). But we provided von Saher leave to amend her complaint in case she could allege that she lacked notice such that her claims were timely under California's generic statute of limitations for property actions. Id. at 968-70 ; see Cal. Civ. Proc. Code § 338. Von Saher's petition for certiorari to the U.S. Supreme Court was denied. 564 U.S. 1037, 131 S.Ct. 3055, 180 L.Ed.2d 885 (2011).
VON SAHER II
Soon after our decision in Von Saher I , the California legislature amended its statute of limitations for actions "for the specific recovery of a work of fine art brought against a museum, ... in the case of an unlawful taking or theft ... within six years of the actual discovery by the claimant or his or her agent." Cal. Civ. Proc. Code § 338. The legislature made the amendment retroactive and von Saher amended her complaint accordingly.
The Museum again moved to dismiss, this time arguing that von Saher's claims conflicted with federal foreign policy. The district court granted the motion. On appeal, we reversed and remanded, over a dissent from Judge Wardlaw. See Von Saher v. Norton Simon Museum of Art at Pasadena , 754 F.3d 712 (9th Cir. 2014) (" Von Saher II ").
The panel majority held that von Saher's state-law claims did not conflict with federal policy concerning Nazi-stolen art "because the Cranachs were never subject to postwar internal restitution proceedings in the Netherlands." Id. at 721. More specifically, von Saher's complaint alleged that "(1) Desi chose not to participate in the initial postwar restitution process, (2) the Dutch government transferred the Cranachs to Stroganoff before Desi or her heirs could make another claim and (3) Stroganoff's claim likely was not one of internal restitution." Id. at 723.[4]
The panel majority refused to afford "serious weight" to an amicus brief filed in the Supreme Court by the U.S. Department of State and the Office of the Solicitor General in Von Saher I . Id. at 724. The panel noted that the brief went "beyond explaining federal foreign policy and appear[ed] to make factual determinations." Id. Namely, the brief suggested that the Cranachs had "been subject (or potentially subject to) bona fide restitution proceedings in the Netherlands," which contradicted the allegations in von Saher's amended complaint. Id.
Although the panel posited that this was "a dispute between private parties," it was "mindful that the litigation of this case may implicate the act of state doctrine." Id. at 725. The case was remanded for further factual development and to determine whether the doctrine applies to von Saher's claims. Id. at 727.
Judge Wardlaw dissented. In her view, the United States, through the amicus brief submitted by the Solicitor General's Office and the State Department, had articulated the foreign policy applicable to conflicts like this one. Id. at 728 (Wardlaw, J., dissenting). The brief conveyed that "World War II property claims may not be litigated in U.S. courts if the property was *1148 'subject' or 'potentially subject ' to an adequate internal restitution process in its country of origin." Id. The brief further explained that the paintings at issue in this appeal "have already been the subject of both external and internal restitution proceedings, including recent proceedings by the Netherlands." Id. Those proceedings were "bona fide," according to the brief, and so "their finality must be respected." Id. Judge Wardlaw determined that "Von Saher's attempt to recover the Cranachs in U.S. courts directly thwarts the central objective of U.S. foreign policy in this area: to avoid entanglement in ownership disputes over externally restituted property if the victim had an adequate opportunity to recover it in the country of origin." Id. at 729. Although Judge Wardlaw did not reach the issue because she concluded the case should be resolved on preemption grounds, she noted that the act of state doctrine may apply. Id. at 730 n.2.
The Supreme Court denied the Museum's certiorari petition. Norton Simon Museum of Art at Pasadena v. von Sher , --- U.S. ----, 135 S.Ct. 1158, 190 L.Ed.2d 912 (2015).
SUMMARY JUDGMENT TO THE MUSEUM ON REMAND
On remand, after denying the Museum's motion to dismiss on timeliness grounds, the district court conducted over a year of discovery and considered the parties' cross-motions for summary judgment. Applying Dutch law, the district court granted summary judgment to the Museum, concluding that:
(1) because CORVO revoked the automatic invalidity of the Göring transaction in 1947, that transaction was "effective" and the Cranachs were considered to be the property of Göring; (2) because Göring was an "enemy" within the meaning of Royal Decree E133, his property located in the Netherlands, including the Cranachs, automatically passed in ownership to the Dutch State pursuant to Article 3 of Royal Decree E133; (3) unless and until the Council annulled the Göring transaction under Royal Decree E100, the Cranachs remained the property of the Dutch State; and (4) because the Göring transaction was never annulled under Royal Decree E100, the Dutch State owned the Cranachs when it transferred the paintings to Stroganoff in 1966.
Hence, the Dutch government possessed good title to the paintings when it sold them to Stroganoff, who then conveyed good title to the Museum.
Analysis
We review de novo summary judgment rulings and questions of foreign law, including whether to apply the act of state doctrine. See Brunozzi v. Cable Commc'ns, Inc. , 851 F.3d 990, 995 (9th Cir. 2017) ; De Fontbrune v. Wofsy , 838 F.3d 992, 1000 (9th Cir. 2016) ; Liu v. Republic of China , 892 F.2d 1419, 1424 (9th Cir. 1989).
The act of state doctrine is a "rule of decision" requiring that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." W.S. Kirkpatrick Co. v. Environ. Tectonics Corp., Int'l , 493 U.S. 400, 405, 409, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) ; see generally Born and Rutledge, International Civil Litigation in United States Courts 751-55 (2007). "The doctrine reflects the concern that the judiciary, by questioning the validity of sovereign acts taken by foreign states, may interfere with the executive branch's conduct of foreign policy." Provincial Gov't of Marinduque v. Placer Dome, Inc. , 582 F.3d 1083, 1089 (9th Cir. 2009). We apply the doctrine only when we are "require[d] ... to declare invalid, and thus ineffective ..., the official act of a foreign sovereign." W.S. Kirkpatrick , 493 U.S. at 405, 110 S.Ct. 701. Hence, we apply *1149 the doctrine here, because "the relief sought" by von Saher would necessitate our "declar[ing] invalid" at least three "official act[s] of" the Dutch government "performed within its own territory." Id.
I. VON SAHER'S THEORY WOULD REQUIRE THE COURT TO INVALIDATE OFFICIAL ACTS OF THE DUTCH GOVERNMENT
Von Saher's recovery hinges on whether she-not the Museum-holds good title to the paintings. The Museum's defense, in turn, depends on its having received good title from Stroganoff, who forfeited his own restitution claim to the paintings when he bought them from the Netherlands in 1966. It is therefore a necessary condition of von Saher's success that the Dutch government's conveyance of the paintings to Stroganoff be deemed legally inoperative. For von Saher to succeed, we would also need to disregard both the Dutch government's 1999 decision not to restore von Saher's rights in the Cranachs and its later statement that her claim to the Cranachs had been "settled." Because it is "essential to" von Saher's cause of action that these three official actions of the Dutch government be held invalid, the act of state doctrine applies. See Marinduque , 582 F.3d at 1085.[5] We examine these three acts in turn.
A. THE DUTCH GOVERNMENT'S CONVEYANCE TO STROGANOFF
As we acknowledged in Von Saher II , the act of state doctrine may apply to quiet title actions like von Saher's that would require a court to nullify a foreign nation's conveyances. 754 F.3d at 725-26 (citing Oetjen v. Central Leather Co. , 246 U.S. 297, 303-04, 38 S.Ct. 309, 62 L.Ed. 726 (1918) ; Ricaud v. Am. Metal Co. , 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733 (1918) ). What matters is "whether the conveyance ... constituted an official act of [the] sovereign." Von Saher II , 754 F.3d at 726. There is little doubt that the Dutch government's conveyance to Stroganoff qualifies as an official act of the Netherlands.
We view the conveyance not as a one-off commercial sale, but as the product of the Dutch government's sovereign internal restitution process.[6] Under that process, the Netherlands passed Royal Decrees E133, to expropriate enemy property, and E100, to administer a system through which Dutch nationals filed claims to restore title to lost or looted artworks. Whatever the exact legal effect of those decrees-and irrespective of whether the district court correctly interpreted their meaning under Dutch law-we cannot avoid the conclusion that the post-war Dutch system adjudicated property rights by expropriating certain items from the Nazis and restoring rights to dispossessed Dutch citizens.[7] No one disputes, for example, *1150 that the Firm successfully availed itself of the post-war system by petitioning for restoration of rights in the artworks it had sold to Miedl.
Expropriation of private property is a uniquely sovereign act. See, e.g. , Oetjen , 246 U.S. at 303, 38 S.Ct. 309 (applying the act of state doctrine to governmental seizures of property); U.S. Const. amend. V. Whether or not the Netherlands effected an expropriation of the Cranachs under Dutch law, the Dutch government acted with authority to convey the paintings after von Saher's predecessors failed to file a claim under E100. Von Saher's expert conceded that the "Netherlands considered itself the lawful owner of the works sold to Goering" and "acted as the[ir] true owner." The Dutch government then unquestionably acted as the owner of the paintings by agreeing to convey them to Stroganoff in exchange for his dropping certain restitution claims. Under the act of state doctrine, "title to the property in this case must be determin[e]d by the result of the action taken by the [Netherlands]." Ricaud , 246 U.S. at 309, 38 S.Ct. 312.
In Von Saher II , we reasoned that if "the Museum can show that the Netherlands returned the [paintings] to Stroganoff to satisfy some sort of restitution claim, that act could 'constitute a considered policy decision by a government to give effect to its political and public interests ... and so [would be] ... the type of sovereign activity that would be of substantial concern to the executive branch in its conduct of international affairs.' " 754 F.3d at 726 (citing Clayco Petroleum Corp. v. Occidental Petroleum Corp. , 712 F.2d 404, 406-07 (9th Cir. 1983) ).
But we see no reason why the Museum cannot likewise show that the Netherlands transferred the paintings to Stroganoff as part of a decades-long "considered policy decision" that was inextricably linked to its rights-restoration proceedings under the royal decrees. In order to sell to Stroganoff, the Dutch government must have concluded that its proceedings with respect to the Cranachs and von Saher's family were final. That interpretation is consistent with the position of von Saher's predecessors, who wrote to the Dutch government that they "waive[d] the right to file for restoration of rights regarding [the Cranachs]," and made a strategic, counseled decision not to file a claim on the Göring transaction in order to keep the substantial sale price.[8] The Dutch government clearly understood the Firm to mean what it said; the government began selling unclaimed artworks shortly after the E100 filing deadline, including other works from the Göring transaction. The record on remand is clear.
The Museum also made the showing specifically requested in Von Saher II -that the conveyance to Stroganoff was a sovereign act made in consideration of a restitution claim. Stroganoff served a formal petition on the Dutch government, asserting rightful ownership of the Cranachs and a Rembrandt based on a claim that the Soviet government had stolen the artworks. Stroganoff's writ of summons to the Dutch Ministers asserted that "he [wa]s the owner of these paintings," requested that the Dutch government inform him whether it was "willing to return the paintings," and if not, "to inform [him] of the reasons for [its] refusal." At the time, *1151 the Dutch government "was not in the business of selling national artworks [such as the paintings] considered to be part of the Dutch cultural patrimony."
After years of negotiations, the Netherlands and Stroganoff decided to "settle the case by means of an amicable arrangement": Stroganoff offered to "buy back" the paintings in exchange for dropping his restitution claims for both the Cranachs and the Rembrandt. The Dutch government entered into the agreement only after carefully considering the public policy ramifications of doing so-the Dutch Minister of Culture initially opposed the proposal because "the two Cranachs are especially important for the Dutch cultural collection." Ultimately, however, the Dutch Minister of Culture considered the settlement to be in "the interest[s] of the country." The Dutch Minister of Finance likewise signed off on the settlement, reinforcing our understanding that the Netherlands entered into the agreement with the careful consideration of high-ranking officials.
Considered holistically, the administration of E100 and E133, the settlement with von Saher's family, and the conveyance of the Cranachs to Stroganoff in consideration of his restitution claim constitute an official act of state that gives effect to the Dutch government's "public interests." Von Saher II , 754 F.3d at 726.
B. THE DUTCH COURT OF APPEALS DECISION NOT TO RESTORE VON SAHER'S RIGHTS TO THE PAINTINGS
Von Saher's theory also would require us to disregard the 1999 Dutch Court of Appeals decision denying the restoration of von Saher's rights in the paintings. This ruling is a second act of state authorizing the transfer of the Cranachs to Stroganoff.
In 1998, von Saher petitioned the Dutch government to surrender all property from the "Goudstikker collection" over which the State had gained control. The Dutch State Secretary rejected the request, advising that "[i]n my opinion, directly after the war-even under present standards-the restoration of rights was conducted carefully."
Von Saher then filed an E100 petition for restoration of rights in the Dutch Court of Appeals (the legal successor to the Council for Restoration of Rights). Von Saher's petition sought relief for all artworks involved in the Göring transaction, including the Cranachs. The Court of Appeals denied the restoration of von Saher's rights in the paintings, noting that "[f]rom the documents submitted it appears that [the Firm] at the time made a conscious and well considered decision to refrain from asking for restoration of rights with respect to the Goring transaction." The Firm had access to legal advisors and was "free ... to have submitted an application for [E100] restoration of rights with the Council," but "neglected to do so for well-founded reasons." The Court of Appeals also offered an opinion on the process, concluding that "[t]he Netherlands created an adequately guaranteed procedure for handling applications for the restoration of rights," which was not "in conflict with international law."[9]
Under E100, the Dutch Court of Appeals (succeeding the Council) was the only venue through which von Saher could *1152 have received restitution for, and restoration of rights in, the Cranachs. By administering the exclusive postwar remedial scheme for artwork taken by the Nazis, and refusing von Saher's restoration of rights in the paintings, the Dutch Court of Appeals carried out an official action that is particular to sovereigns. See Clayco , 712 F.2d at 406. Even if we consider the Court of Appeals decision to be a "foreign court judgment" rather than an agency adjudication, such judgments are treated as acts of state when they "g[i]ve effect to the public interest" of the government. See In re Philippine Nat'l Bank , 397 F.3d 768, 773 (9th Cir. 2005) ; accord Restatement (Second) of Foreign Relations of the United States § 41 cmt. d (1965) ("A judgment of a court may be an act of state."). The Dutch ruling provides an additional act of state that deems valid the transfer to Stroganoff.
C. THE DUTCH GOVERNMENT'S DECISION THAT THE RIGHTS TO THE CRANACHS HAD BEEN "SETTLED"
Based on government activities after the 1999 Dutch Court of Appeals decision, von Saher contends that the act of state doctrine either does not apply or should operate on her behalf.[10] But rather than aid von Saher, those later activities provide a third official act supporting the legality of the Stroganoff transfer.
Inspired by the 1998 Washington Conference Principles on Nazi-Confiscated Art, the Netherlands departed in 2001 from a "purely legal approach" to restitution in favor of "a more moral policy approach." The Dutch government shifted its paradigm at the recommendation of the "Ekkart Committee," which investigated "a great number of post-war claims" and found that one Dutch restitution agency had been "legalistic, bureaucratic, cold and often even callous" in conducting operations.
The new restitution policy was not an official pronouncement that the previous Dutch policy was invalid, however.[11] Nor was the new policy established to re-examine old cases. Far from it, the new policy categorically did not apply to "settled case[s]," defined as those in which "either the claim for restitution resulted in a conscious and deliberate settlement or the claimant expressly renounced his claim for restitution."
To help administer the new policy, in 2001 the Dutch State Secretary of Education, Culture and Science established a "Restitution Committee" charged with considering new restitution applications. The "main task of the Committee" was to advise the State Secretary on "applications for the restitution of items of cultural value of which the original owners involuntarily lost possession due to circumstances directly related to the Nazi regime and which are currently in the possession of the State of the Netherlands ." (Emphasis added).
With a new system in place, in 2004 von Saher filed a claim for 267 artworks looted by the Nazis from the Goudstikker Gallery that were still in the possession of the Dutch government. Crucially, the claim did not include the Cranachs. Indeed, von Saher could not have filed a successful claim on the Cranachs without the consent of the Museum: the Restitution Committee only has authority to hear disputes involving property not currently possessed by the *1153 Netherlands when both the putative original owner and the current possessor request an opinion. The Dutch State Secretary referred the claim to the Restitution Committee, which issued a non-binding recommendation to the Secretary that the Dutch government return certain of the works to von Saher.
Von Saher asserts that the Restitution Committee's nonbinding recommendation to the Secretary was itself an act of state-establishing that von Saher's family "did not abandon its rights in the artworks taken by Goring" by failing to file a timely E100 claim. But that interpretation is incorrect. Advisory recommendations that cannot bind the sovereign are not acts of state. See In re Estate of Ferdinand Marcos, Human Rights Litig. , 25 F.3d 1467, 1471 (9th Cir. 1994) ; see also Sharon v. Time, Inc. , 599 F.Supp. 538, 545 (S.D.N.Y. 1984) (concluding that an advisory commission's findings are not acts of state). The Restitution Committee's recommendation and findings were purely advisory. Within the recommendation, the Committee itself stated that its "job" was "to provide advice in such a way that, if the State Secretary accepts the advice , a situation is achieved that as closely as possible approximates the former situation" before the forced sales. (Emphasis added).[12]
The Dutch State Secretary then issued a binding decision on von Saher's restitution claim that accepted in part and rejected in part the Committee's advice. Importantly, the Secretary disavowed the Committee's findings that von Saher's predecessors had not waived their rights to restoration under E100 in the 1950s: "Unlike the Restitution Committee I am of the opinion that in this case it is a matter of restoration of rights which has been settled." The Secretary concluded that the von Saher claim was "settled" by the 1999 "final decision" of the Court of Appeals, in which the Court found that von Saher's predecessors had consciously foregone their restoration rights. Because von Saher's case was "settled," her claim was "not included in the current restitution policy."
Although von Saher's was a settled claim that fell outside the new policy, the Secretary nonetheless decided, ex gratia , to return to von Saher the over 200 paintings from the Goudstikker Collection that were still in Dutch possession. The Secretary's action "t[ook] into account the facts and circumstances surrounding the involuntary loss of property and the manner in which the matter was dealt with in the early Fifties."
The Dutch government's decision to return the paintings still in its possession did not disrupt the government's prior, binding acts of state concerning the Cranachs. The State Secretary for Education, Culture and Science explicitly stated that the Cranachs were "not a part of the claim for which [she] decided on February 6[, 2006] to make the return." Accordingly, she "refrain[ed] from an opinion regarding the two pieces of art under the restitution policy," and refused to "reverse[ ]" the prior decisions of the State Secretary of Culture and the Dutch Court of Appeals. The Secretary's final determination that rights to the Cranachs had been fully "settled" marks the third act of the Dutch state counseling our application of the doctrine.
II. EXCEPTIONS TO THE ACT OF STATE DOCTRINE DO NOT APPLY
Having concluded that the Dutch government's transfer of the paintings and its later decisions about the conveyance were "sovereign acts," we still "must determine whether any exception to the act of state *1154 doctrine applies." Von Saher II , 754 F.3d at 726. None does.[13]
A. "PURELY COMMERCIAL ACTS"
A plurality of the Supreme Court has recognized a potential exception to the act of state doctrine for "purely commercial acts"-i.e. where "foreign governments do not exercise powers peculiar to sovereigns," but rather "exercise only those powers that can also be exercised by private citizens." Alfred Dunhill of London, Inc. v. Republic of Cuba , 425 U.S. 682, 704-05, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). The Supreme Court and our court have never decided whether such an exception exists. See Von Saher II , 754 F.3d at 727 ; Clayco , 712 F.2d at 408.
Nor must we decide in this case whether such an exception exists. Expropriation, claims processing, and government restitution schemes are not the province of private citizens. Those are "sovereign policy decision[s]" befitting sovereign acts. See Clayco , 712 F.2d at 406. Because the Dutch government's administration of E100 and E133 and its settlement of Stroganoff's restitution claim are not "purely commercial acts," we do not decide whether such an exception exists. See id. at 408.
B. THE "SECOND HICKENLOOPER AMENDMENT"
The eponymous "Second Hickenlooper Amendment" restricts application of the act of state doctrine, "but only in respect to 'a confiscation or other taking after January 1, 1959.' " Republic of Austria v. Altmann , 541 U.S. 677, 713, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (Scalia, J., concurring) (citing 22 U.S.C. § 2370(e)(2) ). In Von Saher II , we floated that although the Dutch government kept possession of the paintings after von Saher's predecessors failed to file a claim by 1951, the Dutch government did not transfer the paintings to Stroganoff until 1966, a conveyance that "may constitute a taking or confiscation." 754 F.3d at 727. Yet as the record illustrates, the Dutch government did not take or confiscate anything from von Saher's family in 1966; the family had long since "waive[d] the right to file for restoration of rights" in order to keep the substantial sale price. Any taking, therefore, occurred before the Second Hickenlooper Amendment became effective.
Further, the Amendment bars application of the act of state doctrine only when the governmental action violates "principles of international law." 22 U.S.C. § 2370(e)(2). As von Saher's expert recognized, "international law respects the law as it stood at the time when the decisions were taken." See United Nations Int'l Law Comm'n, Draft Articles on Responsibility of States for Internationally Wrongful Acts, With Commentaries , art. 13, U.N. Doc. A/56/10 (2001) ("An act of a State does not constitute a breach of an international obligation unless the State is bound by the obligation in question at the time the act occurs.").
When the Dutch government administered E133 and E100, the United States and other Allies imposed claims-filing deadlines for property taken by the Nazis in occupied German zones. Under these schemes, prospective owners who opted *1155 not to file a claim before the deadline were treated as having forfeited their rights to the property. For example, the Court of Restitution Appeals noted that a deadline set in Military Law 59 recognized that "it was imperative to fix a date with finality on which the legal rights of all parties, whether they be individual claimants or successor organizations could be ascertained." Advisory Opinion No. 1 , 1 Court of Restitution Appeals Reports 489, 492 (Aug. 4, 1950). The Court held that by not filing a timely claim, "[t]he claimant by reason of his default lost his right to restitution under the [provision] when the vesting of the claim in the successor organization took place. He is forever barred from making any claim for the restitution of such property." Id.[14] The Dutch system clearly aligned with contemporaneous restitution schemes. Further, the forfeiture by von Saher's predecessors was neither accidental nor ill informed-on the advice of counsel, the family affirmatively chose not to pursue any restoration of rights.
Because the Dutch government did not "confiscate" the paintings from von Saher's family after 1959, and because the conveyance to Stroganoff did not violate international law, the Second Hickenlooper Amendment poses no obstacle to the application of the act of state doctrine.
III. THE POLICIES UNDERLYING THE ACT OF STATE DOCTRINE SUPPORT ITS APPLICATION HERE
Even where "the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application." W.S. Kirkpatrick , 493 U.S. at 409, 110 S.Ct. 701 (citing Banco Nacional de Cuba v. Sabbatino , 376 U.S. 398, 428, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ). The Supreme Court laid out three such policies in Sabbatino :
[1][T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it .... [2][T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. [3]The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence.
376 U.S. at 428, 84 S.Ct. 923 ; see also W.S. Kirkpatrick , 493 U.S. at 409, 110 S.Ct. 701.
All three of these policies support invocation of the doctrine here. Notably, no one has identified an international consensus regarding the invalidity of the Dutch post-war restitution procedures. If anything, the U.S. State Department and Office of the Solicitor General expressed in their amicus brief in Von Saher I that post-war restitution proceedings in the Netherlands were "bona fide." See Von Saher II , 754 F.3d at 729-30 (Wardlaw, J., dissenting). Second, the State Department and Solicitor General's Office confirmed in their brief that upholding the Dutch government's actions is important for U.S. foreign policy:
When a foreign nation, like the Netherlands here, has conducted bona fide post-war internal restitution proceedings following the return of Nazi-confiscated art to that nation under the external restitution policy, the United States has a substantial interest in respecting the outcome of the nation's proceedings .
(Emphasis added).[15] This position makes *1156 practical sense. Reaching into the Dutch government's post-war restitution system would require making sensitive political judgments that would undermine international comity. See W.S. Kirkpatrick , 493 U.S. at 408, 110 S.Ct. 701 (underscoring that "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations" are policies behind the doctrine). For example, von Saher asks us to conclude that filing an E100 claim for the Cranachs in the 1950s would have been "futile." So deciding would demand a judgment that the post-war Dutch system was incapable of functioning, a proposition that has not been proven here. Finally, we are dealing with a government that has been in continuous existence since the relevant acts of state. As noted, the decisions of the Dutch Court of Appeals and the State Secretary that deemed the Cranachs a "settled" question are quite recent. Von Saher asks us to do what the Dutch government refused to do in the 1999 Court of Appeals decision-restore her rights to the Cranachs. Second-guessing the Dutch government would violate our "commitment to respect the finality of 'appropriate actions' taken by foreign nations to facilitate the internal restitution of plundered art." Von Saher II , 754 F.3d at 721.
Our judiciary created the act of state doctrine for cases like this one. In applying it, we presume the validity of the Dutch government's sensitive policy judgments and avoid embroiling our domestic courts in re-litigating long-resolved matters entangled with foreign affairs. Without question, the Nazi plunder of artwork was a moral atrocity that compels an appropriate governmental response. But the record on remand reveals an official conveyance from the Dutch government to Stroganoff thrice "settled" by Dutch authorities. For all the reasons the doctrine exists, we decline the invitation to invalidate the official actions of the Netherlands.[16]
AFFIRMED.

The district court found that the Stroganoff family "never owned" the Cranachs, a fact contested by the Museum and muddied by the record evidence. While we need not determine whether the Stroganoff family once owned the Cranachs, the evidence that it even possibly owned the paintings bears on whether Stroganoff's assertion of ownership to the Dutch government in the 1960s presented a colorable restitution claim, and hence prompted an act of state.

At various times until the Netherlands and the Firm reached a settlement agreement in 1952, certain Dutch authorities took the position that the Göring and Miedl transactions were voluntary. That idea has long since been dispelled, and the forced nature of the transaction is uncontested by the parties.

The parties dispute whether the 1952 settlement released claims involving both the Miedl and the Göring transactions. The district court did not make a factual finding on the issue, and the answer does not affect our resolution of this appeal.

Importantly, the decision in Von Saher II was at the motion-to-dismiss stage, and so von Saher's allegations were assumed to be true. 754 F.3d at 714. As analyzed below, the record on remand does not bear out these allegations.

Because the act of state doctrine provides a rule of decision that deems valid the Stroganoff conveyance, we do not conduct a choice-of-law analysis.

The post-war governmental processes here contrast sharply with, for example, an employee of a city museum purchasing artworks on the open market like any art dealer could do. See Malewicz v. City of Amsterdam , 517 F.Supp.2d 322, 339 (D.D.C. 2007) (finding that the act of state doctrine does not apply in such a case because "there was nothing sovereign about the City's acquisition of the ... paintings, other than that it was performed by a sovereign entity.").

The Museum submitted a compendium of post-war cases in which the Council for Restoration of Rights held that, under E133, the Dutch government expropriated ships and artwork that Dutch nationals had sold to the Germans during the war but were later recuperated. Although we do not rely on these cases for their substantive holdings, they underscore that the post-war Dutch system fixed rights in Nazi-looted property pursuant to official governmental policy-not as purely commercial acts.

Despite that unequivocal waiver, von Saher argues that the Dutch government nonetheless should have kept the paintings on the off chance one of Goudstikker's legal heirs had a change of heart seventy (or more) years later. That position is based on wishful thinking rather than law or fact and, of course, runs counter to the expectation that post-war restitution systems should "achieve expeditious , just and fair outcomes." Von Saher II , 754 F.3d at 721 (emphasis added).

During oral argument, von Saher argued for the first time that the 1999 Dutch Court of Appeals decision is inapposite because it was a "procedural" rather than a "substantive" ruling. Whatever the import of that distinction, it is inaccurate. The record explicitly notes that the Court of Appeals weighed the "substantive" evidence and arguments-many of which were presented here-and found "no serious cause to grant ex oficio restoration of rights."

In her opening brief, von Saher appeared to argue that the act of state doctrine is applicable and should deem invalid the transfer to Stroganoff. In her reply, she shifted to arguing that the doctrine is "inapplicable."

Von Saher's expert expressed "no doubt" that the prior restitution policy was administered "in good faith."

Nonetheless, the nonbinding recommendations do not support von Saher because they concerned only the specific paintings in her claim, which did not include the Cranachs.

In addition to the two exceptions we analyze, "the State Department also has restricted the application of th[e] doctrine, freeing courts to 'pass upon the validity of the acts of Nazi officials.' " Republic of Austria v. Altmann , 541 U.S. 677, 713-14, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (Breyer, J., concurring) (quoting Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij , 210 F.2d 375, 375-76 (2d Cir. 1954) (per curiam) ). However, we do not "pass upon the validity of the acts of Nazi officials"; rather, we "pass upon the validity of the acts of" the Dutch government.

Von Saher acknowledges that Military Law 59 transferred unclaimed property to the Jewish Restitution Successor Organization, a charitable group, and that the Organization sold that property in order to raise money for survivors, but "only after the deadline for claims had expired."

In Von Saher II , we concluded that von Saher's claims against the Museum "do not conflict with foreign policy," and that this case presents, "instead, a dispute between private parties." 754 F.3d at 724. In doing so, we did not give the amicus brief "serious weight." Id. Although Von Saher II is precedential authority, that decision left open whether the act of state doctrine applies. Id. at 725-27. We ought not exclude the State Department's views when considering the doctrine's application, especially when assessing the degree to which our decision will affect foreign policy. We acknowledge that we are not bound by those views. Cf. Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co. , --- U.S. ----, 138 S.Ct. 1865, 1869, --- L.Ed.2d ---- (2018) (holding that courts "should accord respectful consideration to" a foreign government's amicus brief, but are "not bound to accord conclusive effect to the foreign government's statements").

We thank the parties' counsel and amici curiae for submitting extensive and informative briefs detailing the many factual and international law intricacies in this appeal.