# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 29, 2024

Lyle W. Cayce
Clerk

————————

No. 23-20224

————————

Juan Carlos Emden; Nicolas Emden; Michel Emden,

*Plaintiffs—Appellants*,

*versus*

The Museum of Fine Arts, Houston,

*Defendant—Appellee*.

——————————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-3348

——————————————————————————

Before Smith, Haynes, and Douglas, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

In the years leading up to World War II, the Nazis' persecution of European Jews forced Max Emden to sell his three Bernardo Bellotto replica paintings. After the war, the Monuments Men found those paintings in a salt mine in Austria and began the restitution process.[1] One was shipped to the Netherlands to fulfill a claim forwarded by the Dutch Art Property Founda-

_____

[1] The Monuments Men were a group of "scholar soldiers"—museum curators, art historians and professors, librarians, architects, and artists who were also U.S. military officers—acting to facilitate the restitution of art stolen by the Nazis.

tion (the "SNK") from a gallery in Amsterdam. But the SNK omitted one key detail: Bernard Bellotto had not painted the gallery's version.

Failing to recognize that it had received the wrong painting, the SNK adjudicated the competing claims of the gallery and of a former Netherlands resident. It determined that the latter's claim was stronger and shipped the painting to him in the United States. The painting eventually made its way to the Museum of Fine Arts in Houston (the "Museum"), where it resides.

Plaintiffs—Juan Carlos Emden, Nicolas Emden, and Michel Emden (collectively, the "Emdens")—are Max Emden's heirs, seeking to recover the painting. The district court dismissed their claim because of the act of state doctrine, reasoning that any evaluation would require it to question an action of the Dutch government—a foreign state. It would, and that is precisely what the act of state doctrine prohibits, so we affirm the dismissal.

I.

*A.    Pre- and Intra-War*

The dispute centers on two paintings—one owned by Max Emden and one by Hugo Moser—recovered from the Nazis after World War II.

*1. Emden*

Emden owned three paintings by Bernardo Bellotto, including a c. 1764 replica of Belloto's *The Marketplace at Pirna*. Because Bellotto had painted Emden's replica himself, it is known in art parlance as a "By Bellotto."

As they ascended to power, the Nazis persecuted and restricted Jews throughout Germany, pursuing even those non-residents who merely owned businesses or property there. Facing Nazi-induced financial distress, Emden was forced to part with his three paintings, selling them—at below-market prices—to an art dealer, who immediately resold them to the *Reichskanzlei*

(Reich Chancellery) for inclusion in the *Führermuseum*.

### 2. Moser

Moser was a German art dealer and collector who purchased a replica of *The Marketplace at Pirna* in 1928. Though his copy was originally sold as a "By Bellotto," an unknown artist—not Bellotto—had painted it. Moser's copy is therefore known, in art parlance, as an "After Bellotto."

Moser fled Germany for the Netherlands when the Nazis came to power in 1933, bringing his After Bellotto *Pirna* with him. Several years later, just ahead of the Nazi invasion, he fled the Netherlands, leaving the painting with an art restorer in Amsterdam. The painting then made its way to the Goudstikker Gallery, from which a Nazi art dealer purchased it for Hitler's *Führermuseum* in 1942.

### B. Post-War

In 1945, the Monuments Men found Emden's three Bellotto paintings in a salt mine in Austria. Six months later, they recovered Moser's After Bellotto *Pirna* from a storage facility. The Monuments Men transferred all four paintings to the Munich Central Collecting Point ("MCCP") and analyzed each painting, attempting to ascertain each's artist, subject matter, and condition.

Under official American policy, the Monuments Men returned "readily identifiable" art to claimants through their respective allied governments.[2] In the Netherlands, those claims were received and processed by the SNK—a foundation created by the Dutch government. Though the SNK

---

[2] For a detailed recap of the United States's post-war restitution processes, *see Von Saher v. Norton Simon Museum of Art at Pasadena* (*Von Saher I*), 592 F.3d 954, 957–58, 962–63 (9th Cir. 2010).

served as a repository for returned artwork, the Dutch government never decreed that the SNK owned the artworks in its possession.[3]

After receiving a claim from the Goudstikker Gallery for the After Bellotto *Pirna*, the SNK submitted a request to the MCCP. Crucially, though, the SNK's request did not specify which version of the painting the Gallery had claimed. Instead, it merely referred to the *Pirna* as one "*by*" Bellotto. With only one By Bellotto *Pirna* at the MCCP, the Monuments Men responded to the SNK's request by shipping Emden's painting.

Upon its arrival in the Netherlands, Dutch Lieutenant Colonel Vorenkamp signed a custody receipt confirming its delivery to the SNK.[4] But, before it could restitute the painting to the Gallery, the SNK received a conflicting claim from Moser. After adjudicating the conflict in Moser's favor, the SNK shipped him what it believed was the After Bellotto *Pirna*—which was, in actuality, Emden's By Bellotto *Pirna*.[5]

It was not until 1949 that the Monuments Men discovered their error—they had sent Emden's By Bellotto *Pirna* to fulfill a claim for Moser's After Bellotto *Pirna*. The Monuments Men requested the Netherlands to return the painting, but it was too late: The painting was no longer in the

---

[3] According to the Emdens, "[a]t the outset, the SNK's post-war creation was as a foundation to serve as a repository for returned artwork with no authority to transfer the works, and it operated outside existing government Ministries and departments." The First Amended Complaint also alleges an abbreviated, but troubled, history of the SNK, including the arrest of its head for fraud and grifting, a serious lack of expertise, and a "downright chaotic" administration.

[4] That receipt conditioned the delivery of the painting on the Netherlands's agreeing to restore any object that had been delivered to it by mistake.

[5] In 1952, Moser sold the By Bellotto *Pirna* to the American collector Samuel Kress, who, a year later, loaned the By Bellotto *Pirna* to the Museum, converting the loan into a donation in 1961.

SNK's custody, and the Dutch government had begun winding down the entire foundation. So, the request went unfulfilled.

## C.  *Modern Restitution Efforts*

In recent years, the Emdens have attempted to restitute all three Bellotto paintings.

In 2019, the German Advisory Commission on the Return of Cultural Property Seized as a Result of Nazi Persecution, Especially Jewish Property (the "Commission"), reviewed the Emdens' claim for restitution of the other two Bellotto paintings. The Commission's detailed ruling was unequivocal: The Nazis had caused Emden's financial hardship, forcing him to sell the paintings. Additionally, the Commission concluded that the Monuments Men had erroneously restituted Emden's By Bellotto *Pirna* to the Netherlands.

Perceiving the Commission's conclusion as confirming Max Emden's ownership of the painting at the Museum, the Emdens sued the Museum. The district court dismissed their first complaint without prejudice, relying on the act of state doctrine.[6] Though their amended complaint attributed more of the errors to the SNK than to the Dutch government, the court again applied the act of state doctrine, this time dismissing with prejudice.[7]

## II.

## A.  *Standard of Review*

We review a Federal Rule of Civil Procedure 12(b)(6) dismissal under

---

[6] *See generally Emden v. Museum of Fine Arts, Hous.*, No. 4:21-CV-3348, 2022 WL 1307085 (S.D. Tex. May 2, 2022).

[7] *See generally Emden v. Museum of Fine Arts, Hous.*, No. 4:21-CV-3348, 2023 WL 3571973 (S.D. Tex. Apr. 24, 2023).

the act of state doctrine *de novo*. *Spectrum Stores, Inc. v. Citgo Petro. Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) (citing *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008)). "In undertaking this review, we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff.'" *Id.* (quoting *Lane*, 529 F.3d at 557).[8] Still, the plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Upon a party's providing notice of an issue concerning the laws of a foreign state, we "may consider any relevant material or source"—including those "not submitted by a party"—about that foreign state's laws. Fed. R. Civ. P. 44.1; *see also Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 713 (5th Cir. 1999).

## B.    *Act of State Doctrine*

A judicial creation rooted in separation-of-powers principles, the act of state doctrine bars American courts from "sit[ting] in judgment on the acts of the government of another [state], done within its own territory."[9] It "limits, for prudential rather than jurisdictional reasons, the adjudication in

---

[8] Though we may not consider other materials beyond the pleadings, we may examine "any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted).

[9] *Spectrum Stores*, 632 F.3d at 954 (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)); *see also W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964), *superseded in part by* 22 U.S.C. § 2370(e)(2); *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 309 (1918); *see generally* George A. Bermann & Donald E. Childress, Transnational Litig. in a Nutshell 179–93 (2d ed. 2021); Restatement (Fourth) of Foreign Relations Law § 441 (Am. L. Inst. 2024).

American courts of the validity of a foreign sovereign's public acts."[10]  The doctrine "is a vital rule of judicial abstention in the field of foreign relations."[11]  That is because "juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government."[12]

The act of state doctrine applies "even if the defendant is a private party, not an instrumentality of a foreign state, and even if the suit is not based specifically on a sovereign act."[13]  When applicable, it "provides . . . a substantive defense on the merits."[14]

## III.

The Emdens contend that the By Bellotto *Pirna* belongs to them because Moser never obtained good title to it.  Passing judgment on the merits of that claim requires us first to resolve whether the act of state doctrine applies.  Specifically, we must determine whether the SNK's transmission of the painting was an act of the Dutch government.[15]

---

[10] *Walter Fuller Aircraft Sales, Inc. v. Republic of Phil.*, 965 F.2d 1375, 1387 (5th Cir. 1992) (citing *W.S. Kirkpatrick*, 493 U.S. at 404); *see also Banco Nacional*, 376 U.S. at 418 (quoting *Ricaud*, 246 U.S. at 309) (The act of state doctrine "does not deprive the courts of jurisdiction once acquired over a case."); *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).

[11] *Indus. Inv. Dev. Corp. v. Mitsui & Co.*, 594 F.2d 48, 55–56 (5th Cir. 1979).

[12] *Spectrum Stores*, 632 F.3d at 954 (quoting *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765 (1972)).

[13] *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 796 (5th Cir. 2017) (quoting *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir. 1985)).

[14] *Spectrum Stores*, 632 F.3d at 949 (quoting *Altmann*, 541 U.S. at 700).

[15] That the Netherlands is not a party to the suit is of no moment.  *See supra* note 13 and accompanying main text.

According to the Emdens, the act of state doctrine does not apply for four reasons:  *First*, there was no act of state because the SNK believed it was restituting the After Bellotto *Pirna*.  *Second*, the SNK illegitimately, and therefore, necessarily, unofficially delivered the By Bellotto *Pirna* to Moser.  *Third*, U.S. and Dutch foreign policy favors restituting stolen art.  *Fourth*, the Dutch government's acts did not occur exclusively within its territorial boundaries.

We reject each of those theories.  *First*, the SNK's shipping of the misidentified painting is an act of state.  *Second*, the foundation had sufficient governmental trappings—and has been recognized as an official actor—such that we cannot call its actions unofficial.  *Third*, the prudential concerns laid out in *Banco Nacional* tilt in favor of finding an implied negative foreign relations impact.  *Fourth*, all the actions necessary to transfer the painting to Moser occurred within the Netherlands.  Therefore, the district court properly applied the act of state doctrine.

## A.    *Whether There Was an Act of State*

The SNK knew only that it had a replica of Bellotto's *Marketplace at Pirna*.  Ignorant of whether the copy was a By Bellotto or an After Bellotto, the SNK unknowingly assumed it was the latter when adjudicating its ownership and shipping the painting to Moser.  Therefore, the Emdens aver, the SNK did not undertake any action with respect to the By Bellotto *Pirna*.

The district court, rejecting that contention, explained that "the Dutch government['s] *mis*identif[ying] the painting does not undermine the Act of State doctrine's relevance to the present matter" because any ruling still must ask "whether the [foreign] government's conveyance should be

'undone or disregarded.'"[16]

On appeal, the Emdens maintain that the misidentification precluded any action by the SNK on the By Bellotto *Pirna*. Relying on several in- and out-of-circuit cases, they submit that the act of state doctrine bars only the review of an act's *validity*—not its *effect*.

The Emdens primarily rely on *Geophysical Service* for the proposition that our court evaluates the "effect" of an action separately from its "validity." In that case, a Canadian company sued its Texas-based competitor, alleging violations of U.S. copyright law by, *inter alia*, importing copies of the company's seismic line data. 850 F.3d at 788–89. But the competitor received that data from a Canadian agency that was authorized, under Canadian law, "to release it to members of the public upon specific request." *Id.* at 788. In defense, the competitor asserted that the "first-sale doctrine" applied and that the act of state doctrine prevented judicial inquiry into whether its copy was "lawfully made." *Id.* at 793; 17 U.S.C. § 109. The district court agreed, reasoning that any finding to the contrary would have the effect of "deciding that a foreign government acted unlawfully." 850 F.3d at 796.

We reversed, clarifying that the doctrine did not bar review of issues *collateral to* an act of state. "[E]ven if . . . the copies were not 'lawfully made under [U.S. copyright law],' that . . . determination [would] not speak to the validity of the Canadian government's actions . . . ." *Id.* at 797. Nor would that determination speak to the legal effectiveness of the agency's transmitting that data to third parties. Instead, it would resolve only questions of

---

[16] 2022 WL 1307085, at *5–6 (quoting *W.S. Kirkpatrick*, 493 U.S. at 407) (cleaned up); *see also id.* (citing *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303–04 (1918); *Ricaud*, 246 U.S. at 310).

liability arising from that third party's *using* the data in a way that violates U.S. copyright law. In short, the Canadian agency—by distributing copies of the seismic data—did not purport to insulate the recipients of those copies from liability under U.S. copyright law. So, holding a recipient liable for copyright infringement would resolve only the "effect" of the Canadian agency's act in the United States and would not question its validity.

The Emdens interpret *Geophysical Service* as going further, though. In their view, it adopts *United States v. Portrait of Wally*, 663 F. Supp. 2d 232 (S.D.N.Y. 2009), in full, such that we can, and must, review any effect of an act of state. *See Geophysical Serv.*, 850 F.3d at 797.

In *Portrait of Wally*, the New York district court traced a detailed history of that painting's provenance—one not unlike the By Bellotto *Pirna*'s. Bondi, a European Jew, allegedly sold the painting under duress in the prelude to World War II. 663 F. Supp. 2d at 237–39. The U.S. government later recovered the painting and transferred it to the Austrian Federal Office for the Preservation of Historical Monuments ("BDA"). *Id.* at 240.[17] Subsequently, the BDA erroneously restituted *Wally* to the claimant for a different piece of art, entitled *Portrait of his Wife*. *Id.* at 241. Later that same year, an Austrian national gallery bought *Wally* under the name *Portrait of a Woman*. *Id.*

Four years later, a collector bought *Wally*, under its actual name, from the national gallery and later sold his collection to the Leopold Museum in Vienna. *Id.* at 243–45.[18] In 1996, the Leopold loaned *Wally* to the Museum

---

[17] Like the SNK faced difficulties in differentiating between the After and By Bellotto *Pirna*s, the BDA struggled to tell *Wally* apart from the painter's *Portrait of his Wife*. *See Portrait of Wally*, 663 F. Supp. 2d at 240–42.

[18] As part of its act of state defense, the Leopold alleged that the Austrian gov-

of Modern Art in the United States. *Id.* at 246. After the exhibit ended—but before the Museum of Modern Art shipped *Wally* back—the United States brought a forfeiture action against the painting. *Id.*

The district court rejected the act of state defense, offering three rationales. *First*, it held that it was "not being asked to *invalidate* any action by an Austrian governmental authority, but only to determine the effect of such action, if any, on *Wally*'s ownership." *Id.* at 248 (citing *W.S. Kirkpatrick*, 493 U.S. at 409–10). *Second*, it cast doubt on any claims that the "approvals" were official acts as "the [Leopold] has submitted nothing to show that the BDA, the Austrian Ministry of Finance, or the Austrian Federal Ministry of Education had any authority to dispose of artwork other than through the Restitution Commissions." *Id.* (cleaned up). *Third*, "and perhaps most importantly, the [Leopold had] offer[ed] nothing to alter [the] determination [made in an earlier denial of the motion to dismiss] that the balance of interests favors adjudication of this action."[19]

If *Portrait of Wally* bound us, the Emdens would be correct—the act of state doctrine would not bar an inquiry into whether the Museum had converted the By Bellotto *Pirna*. But we and the Emdens read *Geophysical Service* differently. True, as part of its discussion of the act of state doctrine, *Geophysical Service* noted that *Portrait of Wally*'s holding was "persuasive" and even analogized to it. 850 F.3d at 797. Yet that does not end the matter.

---

ernment had to approve both the national gallery's purchase and sale of *Wally*. *Id.* at 248.

[19] *Id.* (citing *United States v. Portrait of Wally, A Painting By Egon Schiele*, No. 99 CIV. 9940, 2002 WL 553532, at *9 (S.D.N.Y. Apr. 12, 2002) ("An inquiry into the BDA's shipment of a painting under the post-war Austria regime would not impinge upon the executive's preeminence in foreign relations, particularly where the restoration of ownership has always been a professed goal of Austrian law and where it is the executive branch itself that brings this forfeiture action . . . .")).

Similarity as to outcome is in no way an endorsement of the *ratio decidendi* underlying *Portrait of Wally*. *Geophysical Service*'s analogy merely assumed, without deciding, that the New York district court's "considering the rightful ownership of the portrait" would not "invalidate any action by [the foreign governmental authority]." *Id.* (cleaned up). On the other hand, in this case, we could consider whether the Emdens are the rightful owners only by calling into question the validity of the Dutch government's actions when the SNK sent the painting to Moser. That we may not do so is confirmed by precedent in our own circuit, our sister circuits, and the Supreme Court.

In *Walter Fuller Aircraft Sales*, the act of state doctrine did not bar us from resolving an ownership dispute over a jet aircraft—even though the defendants were foreign governments. 965 F.2d at 1388. We so ruled because the case "ha[d] nothing to do with title to the aircraft, but [wa]s instead a damages action arising from a contract breach." *Id.* So there was no need to "adjudicate the validity of any of the public acts" of the defendant governments. *Id.* Indeed, as *Walter Fuller* explained, "all the public acts and decisions cited by the defendants may be valid and yet the [government party] still may have breached the contract." *Id.*

In *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133 (2d Cir. 2022), the court similarly reversed the dismissal of an antitrust claim related to price-fixing for remittances and phone calls between the United States and Haiti. The act of state doctrine did not apply because "no official act of Haiti must be deemed invalid for liability to attach under federal law." *Id.* at 135; *see also id.* at 142–43 (citing *W.S. Kirkpatrick*, 493 U.S. at 405–06).

The act of state doctrine did not bar review in *Walter Fuller* and *Celestin* because the issues presented were collateral to the validity or legal effect of the foreign state act. At issue in *Celestin* was the unlawful motivation

behind the foreign state action—not its validity. *Id.* at 144.[20] Similarly, *Walter Fuller* dealt with the enforcement of the terms of a valid contract—not the question of whether the parties, one of which was a foreign state actor, had the capacity to enter that contract in the first place. *See* 965 F.2d at 1388. So, as in *Geophysical Service*, the act of state doctrine did not bar review.

But those claims are quite different from the Emdens'. The act of restitution legally established the owner and possessor of the By Bellotto *Pirna*. The SNK could not have sent the painting without concurrently determining its rightful owner. Thus, any evaluation of the *effect* of the SNK's act intrinsically implicates its *validity*.

The decision in *W.S. Kirkpatrick* puts the final nail into the coffin of the Emdens' theory. Per the Supreme Court, the act of state doctrine applies "when a court *must decide*—that is, when the outcome of the case turns upon—the *effect* of official action by a foreign sovereign." 493 U.S. at 406 (second emphasis added). That is fundamentally incompatible with the reasoning underlying *Portrait of Wally*. So, like the district court, we decline to adopt the *ratio decidendi* of *Portrait of Wally*.

The SNK shipped the By Bellotto *Pirna* to Moser. Any adjudication of the shipping's effect on the painting's ownership would call into question the validity of that act.

The Emdens' first claim fails.

## B.    *Whether the Act Was Official*

The Emdens next assert that, even if the SNK "acted" by delivering

---

[20] *See also* 30 F.4th at 140 (declining to apply the act of state doctrine even after "assum[ing] that a foreign state's official acts executed within that state's territory are valid in that they have the legal effects—like transfers of title, assumptions or repudiations of contractual obligations, and grants of public authority—that they purport to have").

the By Bellotto *Pirna* to Moser, the SNK lacked state-granted legitimacy, making its act unofficial:  Not only did the Dutch government never give the SNK official authority to transfer any paintings, but also the SNK arose from a morass of laws and found legal clarity only in those cases it appealed to the courts and official ministries.

Further, the Emdens assert, the Dutch State Secretary for Education, Culture, and Science has since renounced the SNK, calling it "not a decision-making body" and explaining that the Dutch government only considers "a restitution case settled if the claim for restitution has consciously and deliberately resulted in a settlement or if the claimant has waived the claim for restitution."

The Museum responds to the alleged renunciation by averring that those attributed statements are conclusory and unsupported, a position the district court found compelling.  2023 WL 3571973, at *2.  We concur.  The Emdens' pleadings lack sufficient support to assert plausibly that the Dutch government has renounced the SNK.  *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

*1. The Dutch Royal Decrees and the* Von Saher *Trilogy*

As for the SNK's alleged illegitimacy, we turn to our sister court's thorough analysis of Dutch Royal Decrees E100 and E133 in the *Von Saher* trilogy to refute that position.

At the end of World War II, the Dutch government issued Royal Decrees E100 and E133:  Royal Decree E100 "established a Council for Restoration of Rights ('the Council'), with broad and exclusive authority to declare null and void, modify, or revive 'any legal relations that originated or were modified during enemy occupation of the [Netherlands].'"  *Von Saher v. Norton Simon Museum of Art at Pasadena* (*Von Saher III*), 897 F.3d 1141, 1144 (9th Cir. 2018) (alteration in original).  "The Council had the exclusive

power to order the return of property and to restore property rights to the original Dutch owners." *Id.* Royal Decree E133 permitted the Netherlands to "expropriate enemy assets in order to compensate the Netherlands for losses it suffered during World War II" and "automatically passe[d]" enemy property "in ownership to the State . . . ." *Id.* at 1145.

Combined, those two decrees created a system by which the Dutch government automatically expropriated Dutch property stolen by the Nazis under E133 and then undid that expropriation and re-vested rights in the original owner or his/her heir(s) under E100.[21] Until its dissolution, the SNK handled the restitution process under these decrees. *See Von Saher v. Norton Simon Museum of Art at Pasadena* (*Von Saher II*), 754 F.3d 712, 717–18 (9th Cir. 2014).

In the *Von Saher* trilogy, the Ninth Circuit thrice ruled on a dispute like the one before us. Von Saher was the only surviving heir of Jacques Goudstikker. *Von Saher I*, 592 F.3d at 959. The Norton Simon Museum had obtained a diptych painted by Lucas Cranach the Elder, which Von Saher asserted had been looted by the Nazis from Goudstikker's collection. *Id.* Then, after the war, the Allies sent the diptych to the MCCP, and it was returned to the Netherlands. *Id.* But "after restitution proceedings in the Netherlands, the Dutch government delivered the two paintings to" another claimant in the 1960s. *Id.*

In *Von Saher III*, the court affirmed the summary judgment for the museum on act-of-state grounds. 897 F.3d at 1156. The court focused its analysis on "whether the conveyance constituted an official act of the sovereign." 897 F.3d at 1149 (cleaned up). As it explained, "the Netherlands

---

[21] *See* Lars van Vliet, The Dutch Postwar Restoration of Rights Regime Regarding Movable Property, 87 Legal Hist. Rev. 651, 651 (2019).

passed Royal Decrees E133, to expropriate enemy property, and E100, to administer a system through which Dutch nationals filed claims to restore title to lost or looted artworks." *Id.*

Then, the court confirmed that "[e]xpropriation of private property is a uniquely sovereign act." *Id.* at 1150. It further agreed with the Norton Simon Museum's contention that the "Netherlands considered itself the lawful owner of the works sold to [Nazi Reichsmarschall Hermann Goering] and acted as their true owner" when it "agree[d] to convey them to" the latter claimant. *Id.* (cleaned up). "Considered holistically, the administration of E100 and E133, the settlement with [V]on Saher's family, and the conveyance of the Cranachs to [the latter claimant] in consideration of his restitution claim constitute an official act of state . . . ." *Id.* at 1151.[22]

There is no reason to reach any different conclusion here. The SNK effectuated E100 and E133 until its dissolution, meaning that its "administration of [those decrees] . . . and the conveyance of the [By Bellotto *Pirna*] to [Moser] in consideration of his restitution claim constitute[d] an official act of state . . . ." *Id.* That the court in *Von Saher III* had additional grounds on which it could support its decision that the restitution was an official act, *see supra* note 22, and that the ultimate restitution process it described occurred after the SNK folded has no impact on our analysis.[23] The SNK was the *de*

---

[22] The Ninth Circuit also considered the impact of the Dutch Court of Appeals's 1999 refusal to restore Von Saher's rights to the paintings, 897 F.3d at 1151, and the Dutch government's 2004 "binding decision on [the] restitution claim that . . . concluded that the [V]on Saher claim was 'settled' by the 1999 'final decision' of the Court of Appeals," *id.* at 1153 (emphasis omitted).

[23] Similarly, that the *Von Saher* trilogy never dealt with any issues of mistaken identity—the latter claimant and Von Saher both asserted ownership over the same piece of art and the Dutch government ruled on that same piece of art—does not affect its analysis of the Royal Decrees.

*facto* arm of the Dutch government handling restitution, and both expropriation and restitution are expressly governmental actions.[24]

The Emdens instead point to *Von Saher III*'s discussion of the Dutch government's 2001 Restitution Committee, contending that we should adopt that analysis alone and hold that the SNK's determination was similarly unofficial. *See id.* at 1152–53. But their comparison is inapt.

The Dutch government did change its approach to restitution in 2001. *Id.* at 1152. But

> the new restitution policy was not an official pronouncement that the previous Dutch policy was however invalid. Nor was the new policy established to re-examine old cases. Far from it, the new policy categorically did not apply to "settled cases," defined as those in which "either the claim for restitution resulted in a conscious and deliberate settlement or the claimant expressly renounced his claim for restitution."

*Id.* The new committee merely recommended to the State Secretary actions to take on new restitution claims. *Id.* Von Saher claimed that such recommendations were subsequent acts of state, but the Ninth Circuit disagreed: They were purely advisory, which meant they were not acts of state. *Id.* at 1153 (citations omitted).

Contrary to the Emdens' claims, that new approach to restitution has no impact on our review of the SNK's actions here. Once the SNK decided to ship the By Bellotto *Pirna*, it did so. It did not need the Dutch State Secretary to approve its decision. Thus, the SNK's decisions were not advisory; they were executory.

---

[24] *See Von Saher III*, 897 F.3d at 1150 (citing *Oetjen*, 246 U.S. at 303); *id.* at 1154.

*2. Alternate Grounds*

Even if we chose not to rely on *Von Saher III* and the Royal Decrees, we would still affirm.

The district court ruled that a sentence from the Short General History portion of the 1998 "Origins Unknown report" on the SNK indicated that it was an official actor because it had been "set up by [both] the Ministry of Education, Arts[,] and Sciences and the [M]inistry of Finance." 2023 WL 3571973, at *3.[25] The Emdens respond by suggesting that the historical context of the SNK—namely, that it was a "separate organization" from the Ministries and that it was not funded by them—demonstrates that the district court erred. Further, they contend that the court gave improperly short shrift to the First Amended Complaint's allegations.

But the Origins Unknown report includes not only the "set up" phrase. It also details how the SNK worked within the Dutch government's post-war restitution program. A body set up by the government, operating within it, and exercising governmental powers—even if not funded by it—is best categorized as an official actor. The SNK meets those criteria.

The pleadings further support that understanding. They state that the SNK was *the* restitution agency for the Netherlands: It could request allegedly Dutch art from the MCCP; the foundation's representative was a Dutch

---

[25] The Origins Unknown project was created by the Dutch government "to trace the original owners of the artwork in [the Dutch government's] custody." *Von Saher II*, 754 F.3d at 717; *see generally* Ekkart Comm., Origins Unknown Report on the Pilot Study into the Provenance of Works of Art Recovered from Germany and Currently Under the Custodianship of the State of the Netherlands (Apr. 1998). The Emdens quoted the report in their amended complaint, and the museum attached it to the motion to dismiss, making the district court's and our consideration of the entire document proper. *See Lone Star Fund V*, 594 F.3d at 387.

military officer, and he signed off on behalf of the government; and the SNK submitted Dutch Declaration Form 7056—an official Dutch government form—to claim paintings from the MCCP. Set up as it was and exercising its powers as it did, the SNK was an official actor.[26]

The Emdens' second claim fails.

## C.    *Whether There Would Be a Negative Impact on Foreign Relations*

The Emdens contend, third, that the consensus between U.S. and Dutch foreign policies supports our not applying the act of state doctrine. They point to the U.S. government's advocating for the return of looted art to victims, and, more broadly, to the U.S.'s and Netherlands's embrace of the Washington Principles.[27]  Thus, they contend, even if the SNK performed an official act in shipping the By Bellotto *Pirna*, "the policies underlying the . . . doctrine may not justify its application."[28]

The Museum offers two rebuttals. First, it points to the Dutch government's modern-day process for revoking post-war restitution decisions.

---

[26] We make that determination, of course, for the sake of this case only. We do not claim competence to evaluate the legal structure of a foreign government if such is disputed.

Even accepting, *arguendo*, that the Dutch government has disavowed the SNK in some way, the Emdens lack sufficient citations to suggest that the SNK was not an official actor in the 1940s. If they care to do so, they likely must pursue such a claim in the Netherlands.

[27] *See* U.S. Department of State, Washington Conference Principles on Nazi-Confiscated Art (1998), https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art/.

[28] *Von Saher III*, 897 F.3d at 1155 (quoting *W.S. Kirkpatrick*, 493 U.S. at 409); *see also Geophysical Serv.*, 850 F.3d at 797 ("We are unable to see . . . how passing on TGS's first sale defense will 'imperil the amicable relations between governments and vex the peace of nations.'" (quoting *Jimenez v. Aristeguieta*, 311 F.2d 547, 558 (5th Cir. 1962))).

In its telling, the failure to use that process suggests that government's implicit endorsement of the SNK's restitution decision. Second, the Museum contends the policies underlying the act of state doctrine explicated in *Banco Nacional*, and quoted in *Von Saher III*, support applying the doctrine. Those policy considerations are

> (1) The greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it. (2) The less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. (3) The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence.[29]

In *Von Saher III*, all three policy considerations weighed in favor of applying the act of state doctrine: There was no "identified . . . international consensus regarding the *invalidity* of the Dutch post-war restitution procedures," and "the State Department and Solicitor General's Office confirmed . . . that upholding the Dutch government's actions is important for U.S. foreign policy." *Id.* at 1155. Further, the Dutch government had "been in continuous existence since the relevant acts of state." *Id.* at 1156.

Here, the second consideration may tilt slightly against applying the act of state doctrine. Still, the other two outweigh the second. So, the policy considerations encourage the application of the doctrine.

As was true in *Von Saher III*, the Emdens have not alleged any form of codification concerning the area of law. But, they contend the respective governments have reached a semblance of a consensus on international restitu-

---

[29] *Von Saher III*, 897 F.3d at 1155 (quoting *Banco Nacional*, 376 U.S. at 428) (cleaned up).

tion law with the Washington Principles:  The United States has called out American museums for blocking restitution through the use of affirmative defenses in contravention of the Washington Principles;[30] the Dutch government has joined the United States in adopting the Washington Principles; and the Dutch government has even changed the Dutch art restitution policy to favor museums over individual victims no longer.  We read those allegations together to assert that our foreign relations will be immune from, if not benefited by, a review for consistency with the Washington Principles.

Still, consensus regarding the Washington Principles does not equate to consensus casting doubt on the Dutch post-war restitution process.  The closest the Emdens come to making such an allegation is where they describe the United States as having "criticized as contrary to the Washington Principles the Dutch government's restitution analysis for *adding in a new* 'balancing' test."  First Am. Compl. ¶ 79 (emphasis added).  In other words, even assuming that the restitution decisions may not have been "just and fair solutions" under the Washington Principles, the Emdens have still not shown that they were invalid at the time they were made.

We turn to the second consideration.  Read charitably, *but see supra* note 26, the Emdens claim that the Dutch government has disavowed the

---

[30] U.S. policy includes the following tenets:

(1) a commitment to respect the finality of 'appropriate actions' taken by foreign nations to facilitate the internal restitution of plundered art; (2) a pledge to identify Nazi-looted art that has not been restituted and to publicize those artworks in order to facilitate the identification of prewar owners and their heirs; (3) the encouragement of prewar owners and their heirs to come forward and claim art that has not been restituted; (4) concerted efforts to achieve expeditious, just and fair outcomes when heirs claim ownership to looted art; (5) the encouragement of everyone, including public and private institutions, to follow the Washington Principles; and (6) a recommendation that every effort be made to remedy the consequences of forced sales.

SNK and its restitution proceedings. Thus, the Emdens' claim may differ from Von Saher's claim in that upholding the Dutch government's actions is "[*un*]important for U.S. foreign policy." 897 F.3d at 1155. Whether the Emdens have sufficiently pleaded that fact, though, is irrelevant. The Dutch government still exists, so, as in *Von Saher III*, the third factor tilts towards our applying the act of state doctrine.

Therefore, though the United States and the Netherlands have expressed a desire to restitute stolen art properly, the policy justifications underlying the act of state doctrine still justify our applying it here. The Emdens have pleaded little-to-no codification concerning, or consensus regarding, the validity of the SNK's decisions; the Dutch government still exists; and the Dutch have not sought to disclaim the SNK's actions regarding the By Bellotto *Pirna* nor proceeded through the Netherlands's alternative recovery process for wrongly restituted art. We conclude that adjudicating the Emdens' claim could create a negative impact on foreign relations, even if a limited one. And that is exactly what the act of state doctrine prohibits.

The Emdens' third claim fails.

### D.    *Whether the Act Was Extraterritorial*

Fourth, the Emdens assert that the Dutch government did not act *solely within* the Netherlands. The By Bellotto *Pirna* moved from Austria to the MCCP, to the Netherlands, to the United States—all, the Emdens claim, in a single transaction. Because the act of state doctrine applies only to a sovereign's "act within its own boundaries," *Ricaud*, 264 U.S. at 310, they contend that the multi-national nature of the transaction prevents the doctrine's application.

True, the act of state doctrine includes a territoriality requirement. American courts may, where otherwise proper, sit in judgment on acts of

foreign governments that occurred in the United States. *See Geophysical Serv.*, 850 F.3d at 796 (citing *W.S. Kirkpatrick*, 493 U.S. at 405). But that is not what happened here. The sole extraterritorial action was the ultimate delivery of the By Bellotto *Pirna* to Moser. Even if we focus only on the shipment of the painting—not the adjudication of the competing claims—the shipping occurred in the Netherlands. Therefore, the territoriality requirement is met.

The Emdens cite *Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021 (5th Cir. 1972), to contend that the act of state doctrine does not bar claims where the property sought is sited in the United States. That case focused on whether Cuba's expropriation of a beer and "malta" company's assets included its United States trademark. 462 F.2d at 1023. We ruled that the act of state doctrine did not bar our review of that expropriation because "trademarks registered in this country are generally deemed to have a local identity—and situs—apart from the foreign manufacturer." *Id.* at 1026 (internal quotation marks and citation omitted).

But those facts make the Emdens' claims entirely distinguishable. The "act" here occurred purely in the Netherlands because the "act" was the shipping of the By Bellotto. In other words, the conveyance "c[a]me to complete fruition" in the Netherlands. *Id.* at 1028. Thus, the Emdens' claim is more like the expropriation of sugar that occurred in *Banco Nacional* than like the transfer of the trademark in *Maltina*. *Compare Maltina*, 462 F.2d at 1028, *with Banco Nacional*, 376 U.S. at 413–15.

The Emdens' fourth claim fails.

## IV.

Alternatively, the Emdens ask us to reverse the dismissal of their Declaratory Judgment Action alleging Texas state law claims. They contend that, even if the act of state doctrine prevents their recovery of the By Bellotto

*Pirna*, they still should be able to pursue declaratory relief.

But their request shows exactly why we must affirm the district court's ruling on this too. The Emdens request a declaration that they are the "sole, joint owners of the" By Bellotto *Pirna* and that the Museum's possession constitutes conversion and theft under Texas state law. If we allowed that claim to go forward, and if the Emdens prevailed, the declaratory judgment would inherently cast doubt on the validity of the Dutch government's actions. Worse, it would undercut our application of the act of state doctrine while leaving the Emdens without recompense.

The Emdens' fifth claim fails.

\*       \*       \*       \*       \*

The most straightforward and charitable reading of the Emdens' complaint inevitably requires a ruling by a U.S. court that the Dutch government invalidly sent Moser the By Bellotto *Pirna*. The Emdens may be right: The Monuments Men may have improperly sent the By Bellotto *Pirna* to the SNK; the SNK may have unjustifiably sent Moser the By Bellotto *Pirna* even though he had a claim to only the After Bellotto *Pirna*; and the Museum may be violating the Washington Principles by refusing to return the painting to the Emdens.

But, per the act of state doctrine, it is not our job to call into question the decisions of foreign nations. As pleaded, the SNK's shipping Moser the By Bellotto *Pirna* is an official act of the Dutch government. The validity and legal effect of that act is one that we may not dispute.

The judgment of dismissal is AFFIRMED.

24